Ralph E. IRWIN, Plaintiff,

v.

MARQUETTE MEDICAL SYSTEMS, INC., Defendant.

No. C–1–98–261.

United States District Court, S.D. Ohio, Western Division.

July 20, 2000.

Randolph Harry Freking, Freking & Betz, Cincinnati, OH, for Ralph Irwin, plaintiff.

Scott A. Carroll, Vorys Sater Seymour & Pease, Cincinnati, OH, Mark E. Toth, Brenda S Kasper, Eric E. Hobbs, Michael Best & Friedrich, Milwaukee, WI, for Marquette Medical Systems, defendant.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment and Memorandum in Support (doc. 18); Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (doc. 21); Defendant's Reply (doc. 24); and a Joint Motion by the Parties to Continue the Trial Date (doc. 30).

## BACKGROUND

Plaintiff Ralph E. Irwin brings this action against his former employer, Defendant Marquette Medical Systems, Inc., alleging that Defendant violated the Age

Discrimination in Employment Act, Title 29 U.S.C. §§ 621 *et seq.*, as well as Ohio Revised Code §§ 4112.02 and 4112.99, by terminating his employment on May 29, 1997 because of his age (doc. 1). Plaintiff further alleges against Defendant breach of contract, promissory estoppel, and wrongful discharge in violation of Ohio public policy (*Id.*). At the time of his termination, Plaintiff was 61–years–old (*Id.*). Defendant denies Plaintiff's age discrimination, breach of contract, promissory estoppel, and wrongful discharge claims, asserting that the company rightfully terminated Plaintiff's employment for nondiscriminatory reasons (doc. 3).

The following facts are drawn from the pleadings and documentary evidence in this case. Plaintiff began employment as a salesperson in the medical industry in 1969 and received numerous commendations and sales awards throughout his career (doc. 21, Exs.B–G). Defendant, a manufacturer of heart-monitoring and other cardiology-related equipment, hired Plaintiff as a sales representative on January 1, 1996 after it acquired Plaintiff's former employer, Electronics for Medicine (hereinafter, "E for M") (doc. 18, Carlton Aff.). Michael Breedlove, Defendant's President of the Imaging Division, Steven Flora, Defendant's Vice President of Sales, and Greg Gregory, Defendant's Human Resources Manager, made the decision to hire Plaintiff with the approval of Timothy Mickelson, Defendant's President and Chief Operating Officer, and Michael Cudahy, Defendant's Chief Executive Officer (*Id.*). Once hired, Plaintiff joined Defendant's Cardiology Division Sales Department (hereinafter, "Cardiology Division").

On May 21, 1996, Plaintiff signed Defendant's Cardiology Representative Sales Compensation Plan (hereinafter, "Compensation Plan") (Irwin Dep. at 218–23; doc. 18, Carlton Aff., Ex. 1). The Compensation Plan stated that its provisions "do not constitute a contract of employment", and the Compensation Plan provided that all of Defendant's employees "are employed on an at will basis and are subject to termination with or without cause at company option" (doc. 18, Carlton Aff., Ex. 1; *see* Irwin Dep. at 222) Defendant's employee handbook further stated, in pertinent part, that:

> Employment with [Defendant] and its subsidiaries has always been considered to be on an "at will" basis, which means that your employment and compensation can be terminated, with or without cause, and with or without notice, at any time, at the option of either [Defendant] or you. The President and Board of Directors are the only parties authorized to enter into any agreement or contract for employment or alter the terminable at-will status of any employment.

(doc. 18, Carlton Aff., Ex. 3). Plaintiff admits that he received a copy of the employee handbook during his training and that he retained a copy following the termination of his employment (Irwin Dep. at 232–33).

From January to May, 1996, Plaintiff continued to handle for Defendant the same sales territory and generally the same products as he did for his former employer, E for M (Irwin Dep. at 44). In February 1996, Plaintiff received a Performance Appraisal Form indicating that he had exceeded E for M's sales requirements in 1995 (doc. 21, Exs. G–I; Irwin Dep. at 114–15). Then, in May, 1996, Defendant altered Plaintiff's territory and duties (Irwin Dep. at 56). According to Plaintiff, he went from selling familiar products throughout Indiana, Kentucky and Ohio to selling a larger number of new products in a narrow stretch of territory extending along the Ohio River from Indiana to West Virginia (*Id.* at 53–56, 118, 146).

Required to learn about Defendant's broad cardiology product line, Plaintiff avers that he spent three months in training and that he traveled to Milwaukee, Wisconsin and Cleveland, Ohio for the training (*Id.* at 57, 208–209). While in Cleveland, Plaintiff received training from a Cleve-

land-area sales representative for Defendant, Joseph Levi (*Id.* at 208–209). Plaintiff asserts that Mr. Levi took him to a strip club against his wishes, telling him to "be one of the boys" (*Id.* at 210–11). Later, in his evaluation of Plaintiff's performance, Mr. Levi wrote that one of Plaintiff's weaknesses was "Selling in the 90s" (doc. 21, Ex. J). Defendant notes that Mr. Levi also wrote that Plaintiff was "eager to learn" and that Plaintiff had a "solid understanding of sales process and required steps to close" (*Id.*). Mr. Levi attests in an affidavit that the concept of "Selling in the 90s" refers to the fact that selling in today's market requires a more product-based, highly technical sales approach rather than a relationship-based approach (doc. 25, Levi Aff.).

Plaintiff states that he attempted to learn more about his territory and the customers within his territory. However, according to Plaintiff, Defendant failed to provide him with adequate information about the past sales profiles of his new customers (Irwin Dep. at 78–84). Moreover, Plaintiff contends that, even after he started getting sales orders in his new territory, he did not receive credit for two orders representing $234,000 in sales (*Id.* at 106–108). Nonetheless, Plaintiff avers that he had the highest orders entered in the region for the week of May 22, 1997 and that he was in line to get another order valued at $750,000 from a hospital that had budgeted for such a purchase (*Id.* at 200). Plaintiff also attests that his region was the number one sales region in the country for Defendant (*Id.* at 203; doc. 21, Ex. L).

In response, Defendant argues that Plaintiff generally failed to meet his sales forecast during the fiscal year 1996–1997. According to Defendant, Plaintiff did not receive credit for one sale because the order was never actually booked and Plaintiff did not receive credit for the other sale because the order was not shipped until after the company eliminated Plaintiff's position (doc. 18, Carlton Aff.; *cf.* doc.

21). Defendant contends that, even if the two sales orders discussed by Plaintiff had been credited to him, Plaintiff still would have fallen $286,605 short of his forecast (doc. 18, Carlton Aff.). Additionally, while the hospital had budgeted for a purchase of $750,000, the hospital had yet to choose a vendor (doc. 26, Supp. Carlton Aff.). Defendant attests that it could not credit Plaintiff for the sale until the hospital placed an actual order. Defendant alleges that, overall, Plaintiff finished at only 46.1 percent of his forecast despite the fact that Plaintiff's forecast was the lowest for his region out of consideration for his training and new territory (doc. 18, Carlton Aff.). Defendant further insists that the region performed well in spite of Plaintiff's poor performance and because of the good performances of salespersons Thomas A. Murray and Curtis Hallstrom (doc. 18).

Meanwhile, in 1997, Defendant entered into a strategic alliance with a company known as Physio Control (*see* docs. 18 & 21). On February 26, 1997, Mr. Flora, Defendant's Vice President of Sales, sent an e-mail to employees regarding the alliance (*Id.*). Mr. Flora addressed job security concerns, writing that:

> It is imperative for all of you to understand that we are NOT looking to decrease our sales team because of this alliance and furthermore no ones' [sic] job is in jeopardy. Instead we see more sales coming our way because of the synergys [sic] of the two companies [sic] cooperation. If you still have questions after reading through the documents and discussing the details with your managers, please feel free to call me.

(doc. 18, Carlton Aff., Ex. 2) (emphasis in original). Plaintiff states that, after receiving this e-mail, he spent time learning more about Physio Control (Irwin Dep. at 246–47). However, Plaintiff did not give up any job or look for new employment because of the e-mail (*Id.* at 250). In his deposition, Plaintiff testified that: "There wasn't any need to, for me to be looking elsewhere. I wasn't—I wasn't looking into

other areas of employment, there was no reason for me to be doing that" (*Id.*).

On May 29, 1997, Defendant informed Plaintiff of his termination (*Id.* at 187–189). Bruce Keyser, Defendant's Regional Sales Manager for the Mideast Region, and Mr. Gregory, Defendant's Human Resources Manager, met with Plaintiff to discuss his termination, explaining to Plaintiff that Defendant had decided to eliminate Plaintiff's position "due to business necessity" (*see* doc. 21, Ex. M). According to Defendant, the decision to eliminate Plaintiff's position was made by Mr. Breedlove, Mr. Flora, and Mr. Gregory as well as Mr. Keyser and Christopher Carlton, Defendant's National Sales Manager (doc. 18, Carlton Aff.). During the meeting to discuss his termination, Plaintiff told Mr. Gregory that he believed it would be difficult for him to obtain new employment due to his age (Irwin Dep. at 189). Plaintiff avers that Mr. Gregory, who was 58 at the time of Plaintiff's termination, "kind of concurred" with his statement (*Id.* at 189).

According to Defendant, in the Spring of 1997, Defendant decided to eliminate 16 of its sales positions due to cost, distribution and organization problems within its sales force (doc. 18, Carlton Aff.). Defendant attests that, as part of the workforce reduction and reorganization, it closed the Supplies Division Sales Department, the Defibrillator Division Sales Department, and the Small Account Line within the Monitoring Division Sales Department (*Id.*). Within the Cardiology Division, Defendant reorganized its sales territories, consolidated eight sales regions into six sales regions, and eliminated three sales positions (*Id.*). Defendant admits that the alliance with Physio Control "necessitated adjustments to the existing sales force," making it a major factor in the reorganization (docs. 18 & 24; *see also* doc. 21, Ex. P). Mr. Mickelson (age 48), Defendant's President and Chief Operating Officer, and Mr. Cudahy (age 73), Defendant's Chief Executive Officer, oversaw and approved the reorganization (doc. 18, Carlton Aff.).

Furthermore, Defendant avers that the average age of the decisionmakers with respect to the reorganization was 46.9 and that the average age of the decisionmakers with respect to the elimination of Plaintiff's position was 51.1 (*Id.*). Defendant also states that the average age of the sales force increased as a result of the reorganization (*Id.*). The names, titles, and ages (as of May, 1997) of the sales representatives whose positions Defendant eliminated during the workforce reduction and reorganization are alleged to be as follows:

| Name | Title | Age |
| --- | --- | --- |
| Cotleur, John | Sales Representative–Supplies | 32 |
| Cox, David | Sales Representative–Supplies | 32 |
| DeGolyer, Randy | Sales Representative–Defibrillator | 39 |
| Fournier, Ken | Sales Representative–Supplies | 44 |
| Geigler, Grant | National Field Sales Manager–Supplies | 43 |
| Glockner, Walt | Sales Representative–Supplies | 36 |
| Healy, Thomas | Sales Representative–Small Accounts | 29 |
| Irwin, Ralph | Sales Representative–Cardiology | 61 |
| Johannson, Pia | Sales Representative–Supplies | 39 |
| Josey, Randy | Regional Sales Manager–Supplies | 38 |
| McDonald, Amy | Sales Representative–Supplies | 35 |
| Macey, Leigh | Sales Representative–Small Accounts | 27 |
| Pestana, Kimberly | Sales Representative–Supplies | 35 |
| Shimanek, David | Sales Representative–Cardiology | 39 |
| Smith, Doug | Sales Representative–Small Accounts | 47 |
| Walter, Susan | Sales Representative–Cardiology | 42 |

(*Id.*).

Defendant contends that the company based the decisions as to which positions to eliminate on past sales performance, potential new business within each sales territory, customer satisfaction, and geographic factors (*Id.*). Defendant asserts that, even though Plaintiff's forecast was the lowest in his region, Plaintiff's sales performance was also the worst in his region for the fiscal year 1996–1997 (*Id.*). Defendant points out that no one disputes the fact that Plaintiff reached only 46.1

percent of his sales forecast during the fiscal year 1996–1997 (*Id.*). Defendant alleges that Plaintiff was still able to conduct sales-related activities during the training period (*see* Irwin Dep. at 313–32). Defendant also avers that it received complaints from customers who allegedly stated that Plaintiff lacked knowledge about Defendant's products and that Plaintiff was not sufficiently responsive to customer needs (doc. 18, Carlton Aff.).

In contrast, Plaintiff maintains that the assignment of a new territory, lengthy training, and errors in crediting his sales cast a different light on his performance for the fiscal year 1996–1997 (doc. 21). Plaintiff disputes Defendant's statistics, alleging that Defendant is now providing contradictory and false information concerning the company's reorganization and the its discharge of older employees (*Id.*). For instance, Plaintiff argues that Susan Walter should be excluded from the above list of terminated employees because she was terminated for cause and not due to any workforce reduction and that Don Roberts should be included in the list because he was subject to an adverse employment action around the time of the alleged workforce reduction and reorganization (*Id.*). Moreover, Plaintiff insists that the reorganization produced an overall increase in the number of sales representatives in the Cardiology Division (*Id.*, Exs. R–T). Plaintiff argues that, prior to the reorganization, Defendant employed about 60 sales representatives in eight regions in the Cardiology Division, and, after the reorganization, Defendant employed about 75 sales representatives in six regions (*see id.*, Ex. U).

In reply, Defendant contends that, even if Ms. Walter is excluded from the list and Mr. Roberts is included in the list, Plaintiff fails to demonstrate age discrimination (doc. 24). Defendant avers that the statistics, excluding Ms. Walter and including Mr. Roberts, still show that (1) only five of the 16 employees whose positions were eliminated were over the age of 40 (doc.

26, Supp. Carlton Aff.); (2) only two were over the age of 50 (*Id.*); and (3) the average age of those employees was 39.4 years old, 0.2 years younger than the average age of the sales group prior to the reorganization and 0.4 years younger than the average age of the sales group after the reorganization (*Id.*). Furthermore, Defendant argues, Plaintiff fails to rebut Defendant's evidence showing that it reduced its overall sales force by 16 employees (doc. 24).

Plaintiff nevertheless questions whether Defendant carried out a legitimate reduction in force or reorganization, asserting that Defendant replaced him with Mr. Murray (age 37), a salesperson with qualifications allegedly inferior to Plaintiff's qualifications (Murray Dep. at 30). Plaintiff also contends that his termination allowed Defendant to retain other less qualified and significantly younger employees such as Andrea Deluca (age 25) (doc. 21). Plaintiff argues that his alleged replacement, Mr. Murray, suffered performance problems of his own. In a deposition, Mr. Murray concedes that his sales performance had been "up and down", and that he had been on "probation" for low sales about one year prior to the termination (Murray Dep. at 25–27). Defendant denies that Mr. Murray replaced Plaintiff (docs. 18 & 24), but Plaintiff insists that Mr. Murray took over all but two small areas of Plaintiff's territory (doc. 21). Two sales representatives in their 30s, James Roytek and Mr. Hallstrom, took over the two small areas of Columbus, Indiana and Dayton, Ohio previously covered by Plaintiff (Murray Dep. at 30; Keyser Dep. at 49).

Subsequent to his termination by Defendant, on April 7, 1998, Plaintiff filed a Complaint against Defendant in the United States District Court for the Southern District of Ohio (doc. 1). Defendant answered on July 27, 1998 (doc. 3). This Court exercises jurisdiction over Plaintiff's federal claim pursuant to Title 28 U.S.C. § 1331 and supplemental jurisdiction over Plain-

tiff's state claims under Title 28 U.S.C. § 1367. Defendant now moves this Court for an entry of summary judgment in its favor, asserting that no genuine issues of material fact exist in this matter (doc. 18).

## STANDARD OF REVIEW

The narrow question that we must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Id.* at 321, 106 S.Ct. 2548; *Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 405 (6th Cir.1992); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Guarino,* 980 F.2d at 405.

As the Supreme Court stated in *Celotex,* the non-moving party must "designate" specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Guarino,* 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, " 'the designated portions of the record must be presented with enough specificity that the district court

can readily identify the facts upon which the non-moving party relies.' " *Guarino,* 980 F.2d at 405 (quoting *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990)).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir.1990). Furthermore, the fact that the non-moving party fails to respond does not lessen the burden on the moving party or the court to demonstrate that summary judgment is appropriate. *Guarino,* 980 F.2d at 410; *Carver v. Bunch,* 946 F.2d 451, 454–55 (6th Cir. 1991).

## DISCUSSION

### *I. Age Discrimination Claim*

In Defendant's Motion for Summary Judgment, Defendant contends that Plaintiff fails to raise genuine issues of material fact that would allow a factfinder to conclude Defendant violated the Age Discrimination in Employment Act (hereinafter, the "ADEA"), Title 29 U.S.C. §§ 621 *et seq.,* or Ohio's corresponding anti-discrimination statute, Ohio Revised Code §§ 4112.02 and 4112.99. The ADEA prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." Title 29 U.S.C. § 623(a)(1).Ohio Revised Code §§ 4112.02 and 4112.99 similarly provide that employers shall not discriminate against employees because of age. Ohio courts apply the same analysis used in federal anti-discrimination caselaw when evaluating claims brought under Ohio Revised Code § 4112. *See Plumbers & Steamfitters Joint Ap-*

*prenticeship Comm. v. Ohio Civil Rights Comm'n,* 421 N.E.2d 128, 131–32, 66 Ohio St.2d 192, 196 (1981).

Federal courts analyze an ADEA claim under the shifting burden framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Scott v. Goodyear Tire & Rubber Co.,* 160 F.3d 1121, 1126 (6th Cir.1998) (citing *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1081 (6th Cir. 1994)); *see also Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 350 (6th Cir.1998). Under *McDonnell Douglas,* the burden of production may shift from the plaintiff to the defendant, but the burden of persuasion remains with the plaintiff throughout the analysis. *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1390 (6th Cir.1993). Initially, if a plaintiff lacks direct evidence of discrimination, a plaintiff must establish a prima facie case of age-based employment discrimination by showing by a preponderance of the evidence that (1) he was over the age of 40; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by a younger employee. *See Barnhart,* 12 F.3d at 1390; *Ercegovich,* 154 F.3d at 350.

■ In the case at bar, because Defendant produces evidence indicating that a work force reduction and reorganization occurred within the company at the time of Plaintiff's termination, the Court must also consider the law applicable to work force reductions and reorganizations when examining Plaintiff's prima facie evidence. *See Scott,* 160 F.3d at 1126. According to this law, a plaintiff satisfies the fourth prong of a prima facie case by demonstrating " 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out [the plaintiff] for discharge for impermissible reasons.' " *Id.* (quoting *Barnes v. GenCorp Inc.,* 896 F.2d 1457, 1465 (6th Cir.1990)); *see also Ercegovich,* 154 F.3d at 350. A plaintiff may satisfy this prong by demonstrating a gen-

uine issue of material fact with regard to whether a similarly-situated employee outside the protected class received more favorable treatment than the plaintiff during the reduction in force. *Ercegovich,* 154 F.3d at 350 (citing *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582–83 (6th Cir. 1992)). The employee with whom the plaintiff compares himself must be " 'nearly identical' " in "all of the relevant aspects" of employment. *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994). In most cases, this means the employee and the plaintiff must have shared the same supervisor, have been subject to the same standards, and have engaged in the same employment activities. *Ercegovich,* 154 F.3d at 352 (citing *Mitchell,* 964 F.2d at 583).

Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Barnhart,* 12 F.3d at 1390 (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). If the employer produces evidence of a legitimate nondiscriminatory reason, the burden of production shifts back to the plaintiff to show that the employer's reason is a mere pretext for intentional age discrimination. *Id.; see Ercegovich,* 154 F.3d at 350. Pretext may be demonstrated with "a direct showing that a discriminatory reason more likely motivated the employer or by an indirect showing that the employer's explanation is not credible." *Kline v. Tennessee Valley Auth.,* 128 F.3d 337, 342–43 (6th Cir.1997) (citing *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817).

Here, the Parties agree that Plaintiff falls within the protected class and that Plaintiff was subject to an adverse employment action. Thus, the Court concludes that Plaintiff satisfies the first and second prongs of a prima facie case as a matter of law. However, in the Motion for Summary Judgment, Defendant argues that Plaintiff cannot satisfy the third and fourth

prongs of a prima facie case. Specifically, Defendant contends that Plaintiff fails to produce any evidence contradicting Defendant's evidence that it terminated Plaintiff during a legitimate reduction in force because Plaintiff failed to meet Defendant's sales expectations. Defendant further insists that, even if Plaintiff can establish a prima facie case, Plaintiff cannot show that Defendant's proffered nondiscriminatory reasons for Plaintiff's termination are merely pretextual (*see* docs. 18 & 24). The Court addresses each argument in the following subsections.

### A. Whether Plaintiff Was Qualified

First, Defendant argues that Plaintiff fails to produce evidence demonstrating that he was performing at the level expected of a salesperson in the Cardiology Division Sales Department at the time of his termination. Defendant focuses the Court's attention on the uncontested fact that Plaintiff met only 46.1 percent of his sales forecast for the fiscal year 1996–1997. In addition, Defendant points out that no one disputes that Plaintiff's sales forecast was both the lowest for his region and the worst for his region. Defendant also avers that Plaintiff's customers and co-workers complained of Plaintiff's lack of knowledge about Defendant's products as well as Plaintiff's failure to be responsive to customer needs.

Plaintiff responds to Defendant's Motion by submitting evidence of favorable performance reviews and commendations dated prior to the 1996–1997 fiscal year. For instance, Plaintiff directs the Court's attention to a performance appraisal form signed in February, 1996, indicating that Plaintiff exceeded company standards during 1995 (doc. 21, Ex. G). Plaintiff also asserts that he was required to undergo training in order to learn about Defendant's new products and his new sales territory, and he alleges that this training slowed his sales during 1996–1997. Plaintiff contends that, during this training, Defendant did not provide all the information

he needed to fully develop his sales territory. Plaintiff further alleges that Defendant did not credit him with two orders representing $234,000 in sales and failed to consider that he was in line to get another order valued at $750,000 from a hospital that had budgeted for such a purchase. Plaintiff reminds the Court that, despite this alleged lack of cooperation from Defendant, he entered the highest orders in the region for the week of May 22, 1997.

Nevertheless, Defendant maintains that, even with Plaintiff's one week of high sales, Plaintiff generally failed to meet Defendant's sales expectations during the 1996–1997 fiscal year. In addition, Defendant argues that Plaintiff was not entitled to receive credit for the aforementioned orders. The Court notes that Plaintiff does not dispute that one of the two allegedly uncredited orders was shipped after his termination (doc. 21; Irwin Dep. at 106–108). Defendant asserts that, even if Plaintiff had been eligible to receive credit for both sales, Plaintiff still would have fallen $286,605 short of his forecast. Defendant also alleges that, because the hospital had not yet selected a vendor for the budgeted items, Plaintiff was not eligible for any sales credit.

Moreover, Defendant argues that the prior performance evaluations and commendations submitted as evidence by Plaintiff fail to rebut Defendant's evidence of Plaintiff's poor performance during the 1996–1997 fiscal year. In support of this argument, Defendant relies on Seventh Circuit caselaw finding that, with respect to employee evaluations, "the relevant time to consider is the time of discharge." *Fortier v. Ameritech*, 161 F.3d 1106, 1113 (7th Cir.1998); *see also Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1398–99 (7th Cir.1997) (noting that employee reviews may seek to build morale and motivate as well as objectively evaluate). In *Fortier*, the Seventh Circuit wrote:

> Although, in some circumstances, previous employment history may be relevant and probative in assessing performance

at the time of termination, its limited utility must also be recognized. Certainly, earlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken. Nor can such evaluations, standing alone, create a genuine issue of triable fact when, as here, there have been substantial alterations in the employee's responsibilities and supervision in the intervening period.

*Id.*, 161 F.3d at 1113 (footnote and citation omitted).

Viewing the evidence in a light most favorable to Plaintiff, the Court concludes that reasonable jurors could not differ on the question of whether Plaintiff was performing to Defendant's reasonable satisfaction at the time of his termination. *See McDonald*, 898 F.2d at 1160. Plaintiff fails to offer any evidence rebutting the fact that he met only 46.1 percent of his sales forecast during the 1996–1997 fiscal year, and he fails to produce any evidence tending to show that he was actually entitled to the alleged uncredited sales orders. Plaintiff also does not dispute that his sales forecast was the lowest in his region. Thus, there is no genuine issue of material fact as to whether, during the relevant time of Plaintiff's termination, Plaintiff's performance was the worst in his region. The Court agrees with the Seventh Circuit that employee evaluations are of limited utility, and the Court concludes in this case that the performance evaluations and commendations submitted by Plaintiff in this case are not probative of whether Plaintiff was performing to Defendant's satisfaction at the time of his termination.

■ Even assuming, *arguendo*, that Plaintiff raises genuine issues of material fact with regard to his qualifications at the time of his termination, the Court concludes in the following subsections that Plaintiff fails to raise genuine issues of material fact with regard to whether he was replaced by or treated differently than a person outside the protected class and

with regard to whether Defendant's proffered reasons for his terminations are pretextual.

### B. Whether Plaintiff Was Replaced or Treated Differently

In the Motion for Summary Judgment, Defendant asserts that Plaintiff cannot show that he was replaced by or treated differently than a person outside the protected class during a legitimate work force reduction and reorganization. Plaintiff, however, alleges that a younger man, Mr. Murray, took over 90 percent of Plaintiff's former sales territory and that a younger woman, Ms. Deluca, transferred into the Cardiology Division after Plaintiff's termination. Plaintiff also disputes whether Defendant carried out a legitimate work force reduction, arguing that the statistics show that the Cardiology Division grew after the workforce reduction. In contrast, Defendant contends that, while the reorganization led to a net increase in salespeople in the Cardiology Division, the overall sales force in the company was reduced by 16. Defendant also proffers statistics showing that only five of the 16 employees whose positions were eliminated were over the age of 40.

In considering this evidence, the Court relies on *Barnes*, 896 F.2d at 1465, and its progeny. In *Barnes*, the Sixth Circuit clarified the meaning of a work force reduction:

A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is

hired or reassigned to perform the plaintiff's duties.

*Id.,* 896 F.2d at 1465; *see also Godfredson v. Hess & Clark, Inc.,* 173 F.3d 365, 372–73 (6th Cir.1999); *Ercegovich,* 154 F.3d at 350; *Mitchell,* 964 F.2d at 582–83. Accordingly, in this case, the Court must initially ask whether reasonable minds could differ on the subject of Defendant's alleged work force reduction and the elimination of Plaintiff's position in the Cardiology Division.

Defendant proffers evidence, unrebutted by Plaintiff, showing that the reorganization was company-wide and included the closure of Defendant's Supplies Division, the Defibrillator Division, and the Small Account Line in the Monitoring Division (doc. 18, Carlton Aff.). Defendant eliminated a total of 16 positions company-wide (*Id.*). As Defendant points out, Plaintiff fails to rebut the following evidence concerning the work force reduction:

- ■ Prior to the reorganization, 45.9 percent of the sales representatives were over the age of 40 and 10.2 percent were over the age of 50 (doc. 18, Carlton Aff.)

- ■ Following the reorganization, 48.8 percent were over the age of 40 and 11.0 percent were over the age of 50. The average age of the workforce increased from 39.6 to 39.8 (*Id.*).

- ■ Only five of the 16 employees whose positions were eliminated were over the age of 40 (*Id.*).

- ■ The average age of the 16 eliminated employees was 38.6 (*Id.*).

- ■ Eighteen of the 21 decisionmakers with respect to the reorganization were in the age-protected class. Six of the decisionmakers were over the age of 40. The average age of the decisionmakers was 46.9 (*Id.*).

- ■ Six of the seven decisionmakers with respect to the decision to eliminate Plaintiff's position were in the age-protected class. Three of the seven were over the age of 50. The aver-age age of those decisionmakers was 51.1 (*Id.*).

- ■ The entire reorganization was overseen and approved by Defendant's then–73–year–old Chief Executive Officer, Mr. Cudahy (*Id.*).

Plaintiff contends, though, that Defendant incorrectly included Ms. Walter and excluded Mr. Roberts in the above data. Plaintiff alleges that Ms. Walter, who was 42 at the time of the reorganization, was terminated for cause and not due to the reorganization. Plaintiff also alleges that Mr. Roberts, who was 56 at the time of the reorganization, was actually terminated during the reorganization.

In response, Defendant insists that Ms. Walter's position was in fact eliminated at the time of the reorganization. Defendant also produces evidence showing that Mr. Roberts continued to work for Defendant until March 6, 1998. Defendant argues that, even if Ms. Walter is excluded from and Mr. Roberts is included in the statistics, the statistics would still demonstrate that the average age of those eliminated by the reorganization was under 40. Furthermore, according to Defendant, if Ms. Walter is excluded from the statistics, only four of the 15 employees eliminated were over the age of 40; if Mr. Roberts is included, only five of the 16 employees eliminated were over the age of 40.

After reviewing the evidence submitted in this case, the Court concludes that reasonable jurors could not differ on the issue of whether a legitimate workforce reduction and reorganization took place within Defendant Marquette Medical Systems, Inc. in 1997. Plaintiff's allegations concerning Ms. Walter and Mr. Roberts fail to create any genuine issues of material fact with regard to the reduction in force and reorganization. The unrebutted evidence demonstrates that Defendant closed several sales divisions within the company and eliminated 16 positions. While more relevant to the subsequent subsection addressing Plaintiff's arguments that Defendant's

reasons for his termination are pretextual, the Court notes that the average age of the workforce increased from 39.6 to 39.8 after the workforce reduction and reorganization, and that fewer than one-third of the total employees eliminated were over the age of 40. *See Ridenour v. Lawson Co.*, 791 F.2d 52, 57 (6th Cir.1986) (finding unrebutted statistical evidence that refuted an inference of discriminatory animus on the part of the defendant).

The evidence also indisputably demonstrates that Mr. Murray did not replace Plaintiff. As Plaintiff concedes, Defendant redistributed Plaintiff's territory among existing sales employees—Mr. Murray, Mr. Roytek, and Mr. Hallstrom—in the Cardiology Division. Plaintiff fails to rebut Defendant's evidence showing that these employees assumed Plaintiff's sales territory while maintaining their own territories. Thus, no reasonable juror could find that Plaintiff was replaced after his position was eliminated during a legitimate workforce reduction and reorganization.

■ Undeterred, Plaintiff insists that, even if Defendant did not replace him, Defendant treated him differently than less-qualified persons outside the protected class. Plaintiff points in particular to Mr. Murray, who assumed most of Plaintiff's territory following Plaintiff's termination, and to Ms. Deluca, who transferred into the Cardiology Division after the closing of the Supplies Division. Plaintiff cites *Ercegovich*, 154 F.3d at 351, for the proposition that, while a company bears no obligation to transfer a displaced employee to another position within the company after a reduction in force, a company who transfers other displaced employees but does not place the plaintiff in a new position due to age discrimination violates the ADEA. *See also Godfredson*, 173 F.3d at 374; *Ridenour*, 791 F.2d at 57.

With regard to Mr. Murray, Plaintiff argues that Mr. Murray had incurred low sales figures during his tenure with Defendant. In his deposition, Mr. Murray admits that Defendant had placed him on "probation" due to low sales one year prior to the workforce reduction and reorganization (Murray Dep. at 26–28). Mr. Carlton, Defendant's National Sales Manager, confirms that Mr. Murray had been subject to a "performance improvement program" and Mr. Carlton states that Mr. Hallstrom's sales figures had also needed improvement in the past (Carlton Dep. at 61–63). After reviewing this issue, though, the Court concludes that the relevant time period for the comparison of the performances of Plaintiff and his co-workers is the Spring of 1997, the time during which the employees faced possible termination due to the reduction in force. At that time, the unrebutted evidence demonstrates that the sales figures of Mr. Murray, Mr. Hallstrom, and Mr. Roytek helped the sales region Plaintiff was a part of become the number one sales region in the country for Defendant. Plaintiff lagged behind in his region, reaching only 46.1 percent of his sales forecast. Thus, Plaintiff fails to raise genuine issues of material fact indicating that he possessed qualifications superior to those of Mr. Murray, Mr. Hallstrom, or Mr. Roytek.

As for Ms. Deluca, Defendant insists that she was not similarly-situated to Plaintiff in May of 1997. The Court agrees. Ms. Deluca transferred into the Cardiology Division from the closed Supplies Division, but the unrebutted evidence shows that she continued to perform within the Cardiology Division primarily the same functions as she did within the Supplies Division. The evidence also demonstrates that Ms. Deluca came to the Cardiology Division with a sales expertise that differed from Plaintiff's with regard to products sold. In sum, after viewing the evidence in a light most favorable to Plaintiff, the Court concludes that reasonable jurors could not differ on the question of whether Plaintiff was treated differently than Mr. Murray or Ms. Deluca, persons outside the protected class, because of age discrimination.

■ Plaintiff next attempts to show additional evidence of a discriminatory animus by drawing the Court's attention to comments made by Mr. Levi and Mr. Gregory. Plaintiff asserts that Mr. Levi took him to a strip club against his wishes, telling him to "be one of the boys" (Irwin Dep. at 210–11). Later, in an evaluation of Plaintiff's performance dated August 14, 1996, Mr. Levi wrote that one of Plaintiff's weaknesses was "Selling in the 90s" (doc. 21, Ex. J). Plaintiff alleges that Mr. Levi's report was placed in Plaintiff's personnel file and reported to Plaintiff's supervisor, Mr. Keyser (doc. 21; *see* Keyser Dep. at 26–27). Plaintiff also contends that Mr. Gregory, Defendant's Human Resources Manager, "kind of concurred" with Plaintiff's statement that it would be difficult for Plaintiff to obtain new employment due to his age (Irwin Dep. at 189).

However, Defendant notes that Plaintiff concedes he never sensed that Defendant was hostile to employees in the age-protected class (*Id.* at 208, 212). *Cf. Ercegovich*, 154 F.3d at 356–57 (finding evidence of a discriminatory atmosphere in the plaintiff's workplace). Defendant argues that Plaintiff's conversation with Mr. Gregory, who is just three years younger than Plaintiff, did not engender any pejorative or negative references to Plaintiff's age. In relation to Mr. Levi's "be one of the boys" statement, Defendant asserts that Plaintiff himself did not define this statement as ageist in nature. In describing the statement in his deposition, Plaintiff stated, "He wanted me to—he wanted me to participate more with the camaraderie in that environment and I said, you, I said, I'm not up to this, and he made some—he made some comment and I told him I had to make a phone call, and I left. I just left" (*Id.* at 210).

Defendant further disputes Plaintiff's argument that Mr. Levi's "Selling in the 90s" comment evidences an ageist attitude on the part of Defendant. Mr. Levi attests that the concept of "Selling in the 90s" refers to the fact that selling in to-day's market requires a more product-based, highly technical sales approach rather than a relationship-based approach (doc. 25, Levi Aff.). In the evaluation form, Mr. Levi commented that Plaintiff's knowledge of certain products and operations was weak. Nevertheless, Mr. Levi also noted that Plaintiff was "eager to learn" and that Plaintiff had a "solid understanding of sales process and required steps to close" (doc. 21, Ex. J). Defendant contends that Plaintiff not only fails to demonstrate the ageist nature of Mr. Levi's comments, he also does not present evidence demonstrating that Mr. Levi bore any managerial authority over, or played any meaningful role in, the challenged decision to eliminate Plaintiff's position. *Cf. Ercegovich*, 154 F.3d at 354–55. According to Defendant, the unrebutted evidence shows that the decision to eliminate Plaintiff's position came primarily due to Plaintiff's low sales figures and rested with Messrs. Breedlove, Flora, Gregory, Keyser and Carlton.

Having reviewed the above-detailed statements and comments, the Court concludes that they are not sufficiently probative to allow a factfinder to believe that Defendant intentionally discriminated against Plaintiff because of his age. The Court agrees with Defendant that the statements made by Mr. Gregory and Mr. Levi bear too tenuous a relationship to age. The span of time between Mr. Levi's evaluation and the elimination of Plaintiff's position further weakens the probative value of Mr. Levi's comments. Mr. Levi wrote the evaluation about nine months prior to the workforce reduction and reorganization and Plaintiff's termination. Moreover, Plaintiff fails to raise genuine issues of material fact regarding whether Mr. Levi had authority over or a meaningful role in the decision to terminate Plaintiff's employment. Since comments " 'by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [can not] suffice to satisfy the plaintiff's burden . . .' of demonstrating an-

imus", the Court concludes that Plaintiff cannot rely on Mr. Levi's evaluation-form comments to support a prima facie case. *Bush v. Dictaphone Corp.,* 161 F.3d 363, 369 (6th Cir.1998) (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring)).

Plaintiff thus fails to offer additional evidence sufficiently probative to allow a factfinder to believe Defendant singled Plaintiff out for discharge for impermissible reasons. Accordingly, he cannot satisfy the fourth prong of a prima facie discrimination case. Even assuming Plaintiff did satisfy this prong, Plaintiff does not sufficiently demonstrate that Defendant's proffered reasons for his termination are pretextual.

### C. Whether Defendant's Proffered Reasons Are Pretextual

Defendant contends, and the Court agrees, that Plaintiff fails to rebut its evidence of an objective plan to reduce and reorganize its sales force. As noted above, Defendant proffers that it eliminated Plaintiff's position during the reorganization because Plaintiff did not meet its sales expectations. Citing *Buhrmaster v. Overnite Transp. Co.,* 61 F.3d 461, 463 (6th Cir.1995), and *Ridenour,* 791 F.2d at 57, Defendant also asserts that it is entitled to a presumption that its actions were not discriminatory since (1) Defendant hired Plaintiff only a short period before the reduction in force and reorganization; (2) the average age of the decisionmakers with respect to the reorganization was 46.9 and the average age of the decisionmakers with respect to the elimination of Plaintiff's position was 51.1; and (3) the average age of the sales force increased as a result of the reorganization.

In *Buhrmaster,* 61 F.3d at 463, the Sixth Circuit upheld a jury instruction referring to the "same actor" inference. In so doing, the Sixth Circuit followed two circuits that used the "same actor" inference to affirm dismissals of age discrimina-

tion claims. *Id.* (citing *Proud v. Stone,* 945 F.2d 796 (4th Cir.1991); *Lowe v. J.B. Hunt Transp., Inc.,* 963 F.2d 173 (8th Cir. 1992)). According to the Sixth Circuit, the "same actor" inference embodies the idea that "[a]n individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class." *Buhrmaster,* 61 F.3d at 464.

In the case at bar, Defendant argues that it is entitled to the "same actor" inference because essentially the same people made the decision to hire Plaintiff and to eliminate Plaintiff's position within a span of about one and one-half years. Messrs. Breedlove (age 53), Flora (age 45), and Gregory (age 58) made the decision to hire Plaintiff in January of 1996 while Messrs. Breedlove, Flora, Gregory, Keyser (age 47), and Carlton (age 34) made the decision to eliminate Plaintiff's position in May of 1997. Messrs. Mickelson (age 48) and Cudahy (age 73) oversaw both of these decisions.

In contrast, Plaintiff argues that any inferences arising from the above alleged facts must be reached and weighed by the trier in fact and not this Court. Plaintiff also asserts that Defendant has changed its reasons for the workforce reduction and reorganization from the time it made its position statement to the Equal Employment Opportunity Commission (hereinafter, "EEOC") in April of 1998 to the time it filed a Motion for Summary Judgment in November of 1999. Defendant disputes this allegation, contending that the company admitted that its affiliation with Physio Control was a major reason for the workforce reduction and reorganization (*compare* doc. 21, Ex. P *with* doc. 18).

After examining this matter, the Court concludes that Defendant has been consistent in its reasons for the workforce reduction and reorganization. The Court notes that Defendant admitted in its position statement to the EEOC that Plaintiff "was laid off, with 15 other salespersons nation-

wide, as part of a significant reduction in force flowing from a reorganization that resulted in large part from Marquette's affiliation with a company called Physio Control" (doc. 21, Ex. P). In its Motion for Summary Judgment, Defendant states that, in the Spring of 1997, it was "faced with a very costly distribution structure." Defendant further states that it "entered into a strategic partnership with a company called Physio Control in the hopes of expanding the range of products available to Defendant's customers. That alliance also necessitated adjustments to the existing sales force" (doc. 18).

Because Plaintiff does not offer any evidence sufficient to allow a reasonable factfinder to believe Defendant acted with a discriminatory animus in eliminating Plaintiff's position in May of 1997, the Court concludes that Plaintiff fails to show that Defendant's proffered reasons for his termination are pretextual. Accordingly, the Court concludes that Plaintiff fails to raise genuine issues of material fact sufficient to allow a reasonable factfinder to conclude that Defendant violated the ADEA, Title 29 U.S.C. §§ 621 *et seq.*, or Ohio Revised Code §§ 4112.02 and 4112.99.

## II. Public Policy Claim

█ Defendant next argues that summary judgment should be granted in its favor with relation to Plaintiff's common law tort claim against Defendant for wrongful termination in violation of public policy. Ohio follows the common law employment-at-will doctrine that allows employers to terminate the employment of their employees with or without cause. *See Srail v. RJF Int'l Corp.*, 126 Ohio App.3d 689, 709, 711 N.E.2d 264, 277 (1998) (citing *Henkel v. Educational Research Council of Amer.*, 45 Ohio St.2d 249, 255, 344 N.E.2d 118, 121–22 (1976)); *see also Painter v. Graley*, 70 Ohio St.3d 377, 382, 639 N.E.2d 51, 55 (1994). However, Ohio also recognizes an exception to this at-will doctrine: wrongful termination in violation of "clear public policy". *Paint-*

*er*, 70 Ohio St.3d at 383, 639 N.E.2d at 56 (citing *Greeley v. Miami Valley Maintenance Contractors, Inc.*, 49 Ohio St.3d 228, 234, 551 N.E.2d 981, 986 (1990)); *see also Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 677 N.E.2d 308 (1997). The Ohio Supreme Court clarified in *Painter* that "[t]he existence of such a public policy may be discerned by the Ohio judiciary based on sources such as the Constitutions of Ohio and the United States, legislation, administrative rules and regulations, and the common law." *Id.*, 70 Ohio St.3d at 384, 639 N.E.2d at 56.

█ Defendant asserts that, because Plaintiff fails to raise genuine issues of material fact related to his federal and state statutory age discrimination claims, Plaintiff also cannot support a tort claim for wrongful termination in violation of Ohio public policy. After reviewing this matter, the Court agrees with Defendant and finds that Plaintiff fails to allege facts sufficient to allow a reasonable factfinder to conclude that Defendant's act of terminating Plaintiff contravened a clear public policy. Accordingly, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's common law tort claim for wrongful termination in violation of public policy.

## III. Promissory Estoppel/Breach of Implied Contract Claim

Finally, Defendant contends that it is entitled to summary judgment on Plaintiff's claims of promissory estoppel and breach of an implied employment contract. In his pleadings, Plaintiff alleges that an e-mail sent by Defendant's Vice President of Sales, Mr. Flora, amounted to an assurance that his job was secure despite Defendant's alliance with another company, Physio Control. Plaintiff further asserts that, based on this alleged assurance of job security, and to the detriment of his total sales figures, he spent time establishing a relationship with Physio Control. Defendant admits that the alliance "necessitated adjustments to the existing sales force",

making the alliance a major factor in the reorganization (docs. 18 & 24; doc. 21, Ex. P). However, Defendant maintains that, regardless of the impact the alliance with Physio Control may have ultimately had on the sales force, the e-mail did not create a specific promise of continued employment or an implied employment contract.

As noted in the preceding section, Ohio follows the employment-at-will doctrine. Thus, Ohio law generally provides that, in the absence of a written employment contract stating a term of duration, an employment relationship is terminable at the will of either the employer or the employee. *See Srail,* 126 Ohio App.3d at 709, 711 N.E.2d at 277 (citing *Henkel,* 45 Ohio St.2d at 255, 344 N.E.2d at 121–22); *see also Godfredson,* 173 F.3d at 376 (citing *Humphreys v. Bellaire Corp.,* 966 F.2d 1037, 1040 (6th Cir.1992)). Promissory estoppel may be invoked as an exception to this common law employment at will doctrine. *Godfredson,* 173 F.3d at 376 (citing *Humphreys,* 966 F.2d at 1041). In addition, the facts and circumstances surrounding an oral employment-at-will agreement may transform the at-will agreement into an implied contract for a definite term. *See Mers v. Dispatch Printing Co.,* 19 Ohio St.3d 100, 104, 483 N.E.2d 150, 154 (1985). Nonetheless, "seldom will an employee, failing to establish promissory estoppel to alter an employment-at-will agreement, be able to establish an implied employment contract based on the same set of facts." *Shaw v. J. Pollock & Co.,* 82 Ohio App.3d 656, 661, 612 N.E.2d 1295, 1299 (1992).

■■■ To establish a claim for promissory estoppel in the employment context, Ohio courts require a plaintiff to prove: " '(1) that the employer made a promise, (2) which it reasonably should have expected to induce action or forbearance by the employee, (3) that there was such action or forbearance, and (4) injustice can only be avoided by enforcement of the promise.' " *Godfredson,* 173 F.3d at 376 (quoting *Humphreys,* 966 F.2d at 1041). To support a promissory estoppel claim,

" '[s]pecific promises of job security must be clear and unambiguous.' " *Srail,* 126 Ohio App.3d at 709, 711 N.E.2d at 278. According to the Ohio Supreme Court, " 'a promise of future benefits or· opportunities without a specific promise of continued employment does not constitute promissory estoppel.' " *Godfredson,* 173 F.3d at 376 (quoting *Wing v. Anchor Media, Ltd. of Texas,* 59 Ohio St.3d 108, 110–11, 570 N.E.2d 1095, 1099 (1991)).

■■■ In this case, Defendant focuses the Court's attention on the language in the Compensation Plan providing that all of Defendant's employees "are employed on an at-will basis". Plaintiff signed the Compensation Plan on May 21, 1996. Defendant contends that, while the Compensation Plan is not an employment contract *per se,* it is a written agreement evidencing Plaintiff's at-will employment status. Plaintiff also possessed a copy of the employee handbook, which stated that "Employment with [Defendant] and its subsidiaries has always been considered to be on an 'at will' " basis. Based on this clear and unambiguous language, Defendant argues, Plaintiff's promissory estoppel claim must fail.

Furthermore, Defendant asserts that the e-mail from Mr. Flora was not a specific promise of job security. In support of its argument, Defendant points to caselaw indicating that neither a manager's statement assuring a plaintiff of a "secure future" or "secure career", *Anders v. Specialty Chem. Resources, Inc.,* 121 Ohio App.3d 348, 351, 700 N.E.2d 39, 41 (1997), nor a letter from a company chairman stating that "every effort" would be made to help displaced employees, *Srail,* 126 Ohio App.3d at 709–10, 711 N.E.2d at 277–78, constituted specific promises of job security to the Ohio appellate courts. Therefore, Defendant maintains, Plaintiff cannot meet the first requirement of a promissory estoppel claim.

Defendant also insists that Plaintiff cannot meet the second requirement of a

promissory estoppel claim, namely that Plaintiff relied on any alleged promise contained in the e-mail. In particular, Defendant contends that Plaintiff did not search for or give up another job in reliance on the e-mail. *See Holthaus v. Cincinnati Bd. of Educ.*, 76 Ohio App.3d 443, 448, 602 N.E.2d 360, 363 (1991) (noting that detrimental reliance could be shown with evidence that the plaintiff either looked for or turned down other job opportunities). In his deposition, Plaintiff testified that "There wasn't any need to, for me to be looking elsewhere. I wasn't—I wasn't looking into other areas of employment, there was no reason for me to be doing that" (Irwin Dep. at 250). Plaintiff, however, now argues that his detrimental reliance can be shown with his allegation that, based on the optimistic view in the e-mail of the strategic alliance, he worked to form a relationship with Physio Control to the detriment of his sales figures.

After reviewing this issue, though, the Court finds that Plaintiff knew or reasonably should have known that he could have been terminated at any time. The Compensation Plan and employee handbook indicated such, and the e-mail did not provide Plaintiff with a specific promise that his job would continue for any certain length of time. Instead, the Court finds that the e-mail sought to alleviate general worries that naturally arise when two companies enter into an alliance. In other words, the e-mail attempted to reassure employees that the company did not have any immediate plans to change its existing state of affairs. As the unrebutted evidence shows, the existing state of affairs at Defendant Marquette Medical Systems, Inc. included sales employees subject to at-will employment. Additionally, the Court finds that Defendant could not reasonably anticipate that the e-mail would cause any of its sales employees to put their sales figures at risk to order to form relationships with Physio Control. Moreover, the Court finds that Plaintiff fails to demonstrate that he relied on the e-mail to his detriment. Finally, the Court finds that the e-mail did not create an enforceable implied employment contract. Therefore, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's claims of promissory estoppel and breach of an implied contract.

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS Defendant's Motion for Summary Judgment (doc. 18) and DISMISSES Plaintiff's Complaint WITH PREJUDICE. The Joint Motion to Continue the Trial Date is hereby DENIED AS MOOT (doc. 30).

SO ORDERED.