Fredrick P. GODFREDSON,
Plaintiff–Appellant,

v.

HESS & CLARK, INC., Defendant–
Appellee.

No. 98–3348.

United States Court of Appeals,
Sixth Circuit.

Argued March 12, 1999.

Decided April 8, 1999.

Grant A. Wolfe (argued and briefed), Matan, Geer & Wright, Columbus, Ohio, for Plaintiff–Appellant.

James E. Davidson (argued and briefed), Schottenstein, Zox & Dunn, Columbus, Ohio, for Defendant–Appellee.

Before: MERRITT, KENNEDY, and GILMAN, Circuit Judges.

## OPINION

GILMAN, Circuit Judge.

Fredrick P. Godfredson began working for Hess & Clark, Inc. in August of 1990. Starting in 1992, he became the Director of Marketing for KenVet Nutritional Care, its new pet food division. Hess & Clark terminated his employment in 1995, citing the business failure of KenVet Nutritional Care and the consequential reduction in force. Shortly thereafter, Godfredson sued Hess & Clark for age discrimination, wrongful discharge in violation of Ohio's public policy, the intentional infliction of emotional distress, and promissory estoppel. The district court, after ruling that Godfredson had failed to make out a *prima facie* case on any of these claims, granted summary judgment in favor of Hess & Clark. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

In August of 1990, Hess & Clark purchased Veratec, a Massachusetts-based agricultural-pharmaceutical and milk-filtration products business. Godfredson had worked in the sales and marketing departments at Veratec and its predecessor company since 1972. At the time of purchase, Hess & Clark offered employment to numerous Veratec employees, including Godfredson. He accepted Hess & Clark's offer of employment and moved from Boston, Massachusetts to Ashland, Ohio.

Hess & Clark confirmed the terms of Godfredson's employment in a July 12, 1990 letter that set forth Godfredson's proposed salary, benefits, pension plan, and severance pay. Godfredson signed the letter agreement on August 3, 1990, and began his employment one week later. Two of the terms contained in the letter agreement are at issue on appeal. First, the severance provision states that "[i]f during the first twenty-four months of employment by Hess & Clark, Inc. you are involuntarily terminated ... for reason(s) other than misconduct[,] you will receive one full year regular salary." Second, the letter agreement provides that it is "not a contract of employment for a definite duration, and your employment continues at-will and may be terminated with or without cause at any time."

Godfredson also signed two other documents titled "Employment Agreement" on August 11, 1990 and May 2, 1991, both of which begin with the following statement: "Each salaried exempt employee of [the company] will read and sign this Agreement to help establish a common understanding of 1) *The general employment relationship,* and of 2) *The need to safeguard proprietary information.*" (emphasis in original). Both documents clearly state that the employment is at-will, and that the company has the right to terminate the employment relationship "at any time without cause or notice." Godfredson, however, disputes the validity and enforceability of these agreements.

Concerned about his upcoming retirement, Godfredson testified that he had discussed his concerns with the president of Hess & Clark, Bruce Bookmyer, during a meeting in July of 1990. Godfredson said that he had told Bookmyer that he wanted to retire with the company at 65 years of age, to which Bookmyer allegedly responded: "I see no problem with you retiring at Hess & Clark.... [Y]ou should be able to work with Hess & Clark for the next ten years." Bookmyer testified that he had no recollection of such a conversation.

When initially hired, Godfredson assumed marketing responsibility for two of Hess & Clark's divisions—KenAg and KenVet. KenAg was consolidated with the general Hess & Clark business in May of 1992, at which time Godfredson became the Director of Marketing for KenVet. The parties dispute whether Godfredson still retained his responsibilities as Director of Marketing for KenAg after this consolidation.

In September of 1992, Hess & Clark developed KenVet Nutritional Care, a pet food business. Godfredson became the Director of Marketing for this new business, to which he devoted between 60 and 80 percent of his time. Based on his market research, Godfredson estimated that the pet food business could achieve approximately $ 59.9 million in sales and $ 12.9 million in profits during its first three years of operation. Although the record clearly reflects that Godfredson held a position of primary importance within KenVet Nutritional Care, the parties dispute the extent to which Godfredson initiated and was responsible for this division. Godfredson also claims that despite the amount of time that he spent developing the pet food business, his salary came solely from the KenVet budget.

KenVet Nutritional Care was not a success. Although all of the pet food business's start-up costs had been absorbed by July of 1995, and it was poised to sign several multi-million dollar deals, the busi-

ness suffered a loss of greater than $10 million during its first three years of operation. Godfredson testified that he was not exclusively responsible for this loss. He also referred to Bookmyer's deposition, in which Bookmyer stated that he did not know who was to blame for the division's failure.

Ultimately, Hess & Clark decided to eliminate the pet food business. On July 23, 1995, Bookmyer and Dr. Jeff Moorman, the Director of Operations, terminated Godfredson's employment. Godfredson was then 59 years of age. Bookmyer and Moorman informed him that the reason for his termination was the poor performance of KenVet Nutritional Care and the corporate decision to eliminate the pet food business. Godfredson received $8,994 in severance pay. According to Godfredson's testimony, Bookmyer had always been civil to him and was courteous to him during the termination meeting.

Once Hess & Clark decided to eliminate the pet food business, it restructured KenVet and instituted a reduction in force. During July and August of 1995, it terminated 18 other KenVet and KenVet Nutritional Care employees, ten of whom were less than 40 years of age. Hess & Clark contends that this reduction in force was necessary because it had eliminated the pet food business, and that the reduction in force was the basis for Godfredson's termination. Moreover, Bookmyer testified that without the pet food business, KenVet was not large enough to justify Godfredson's continued employment as the Director of Marketing.

Godfredson, on the other hand, alleges that he was terminated because of his age, and that the reduction in force was pretextual. He claims that he was replaced by two younger employees, David Housewright and Jeff Moorman. Moreover, he argues that the 18 other employees who were terminated worked exclusively for KenVet Nutritional Care, and that no other employees who worked simultaneously for KenVet and KenVet Nutritional Care were terminated as part of the reduction of force. The record, however, does not clearly identify the divisions for which the other terminated employees worked. Godfredson further claims that he should have been given the opportunity to transfer within the company.

Another charge of discrimination related to Godfredson's severance pay. Specifically, he alleges that his severance package was substantially less than that offered to another former Veratec employee, David New, who was hired at approximately the same time as Godfredson and who was terminated one year prior to the 1995 reduction in force. In support of his position, he points out the discrepancies in Bookmyer's and Moorman's testimony regarding how the 1995 severance packages were determined. Godfredson argues that this "create[s] an inference that the articulated basis for the disparate treatment in severance pay is pretextual." In his deposition, however, Godfredson acknowledged that he was aware of only two other individuals who had been offered severance packages as part of the 1995 reduction in force, and that these employees received severance packages that were the same as or smaller than his own.

In December of 1996, Godfredson filed suit in the United States District Court for the Northern District of Ohio, alleging (1) age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634, (2) wrongful discharge in violation of Ohio's public policy, (3) the intentional infliction of emotional distress, and (4) promissory estoppel. The district court, after holding that Godfredson had failed to make out a *prima facie* case on any of these claims, granted summary judgment in favor of Hess & Clark.

## II. ANALYSIS

### A. Standard of review

We review *de novo* the district court's grant of summary judgment. *See Smith v. Ameritech,* 129 F.3d 857, 863 (6th Cir.

1997). Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The judge is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial is presented when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505.

## B. Age discrimination

Claims under the ADEA are generally analyzed within the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (explaining the burden-shifting format). *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 310–13, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (modifying the *McDonnell Douglas* framework in ADEA cases). Under the modified *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case by showing that (1) he was a member of the protected class, (2) he was subjected to an adverse employment action, (3) he was qualified for the particular position, and (4) the successful applicant was a substantially younger person. *See Bush v. Dictaphone Corp.*, 161 F.3d 363, 368 (6th Cir.1998).

This framework is further modified if a plaintiff is discharged in connection with a reduction of force. In such a case, the plaintiff is not required to plead the fourth prong of the *prima facie* framework because in a reduction-of-force situation the plaintiff is not in fact replaced.

*See Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1126 (6th Cir.1998). Instead, the plaintiff must present " 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out [the plaintiff] for discharge for impermissible reasons.' " *Id.* (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990)) (brackets in original). If the plaintiff makes out a *prima facie* case, the burden then shifts to the defendant to produce evidence of a non-discriminatory reason for its action, which will necessarily be the alleged reduction in force. *See id.; McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. 1817. The burden then returns to the plaintiff to demonstrate that the defendant's proffered reason is pretextual. *See Scott*, 160 F.3d at 1126; *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. 1817.

The parties agree that Godfredson was over 40 years of age at the time of his termination and that he was subjected to an adverse employment action. They disagree, however, on the issues of whether he was qualified for his particular position and whether he was terminated as part of a legitimate reduction in force.

### 1. Was he qualified for his particular position?

Godfredson claims that he was qualified for his position at the time of his termination. He specifically argues that others were at least partially responsible for the problems associated with the pet food business, that the business was poised to sign two multi-million-dollar deals at the time of its elimination, and that business losses are rarely due to a single cause. Even Bookmyer, he notes, said that he did not know who was to blame for the losses incurred by KenVet Nutritional Care.

On the other hand, Hess & Clark argues that Godfredson held a management position of significant responsibility when the pet food business failed, causing millions of dollars in losses. Moorman testified that Godfredson was "not doing his job on the

marketing of the business, the marketing of the pet food or the [KenVet products], either one."

■ In order to show that a plaintiff is qualified, "[he] must prove that he was performing his job at a level which met his employer's legitimate expectations." *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir.1990) (internal quotation marks and citation omitted). The role of the court is not to review the employer's business decisions, but rather to determine if the employee was performing to the employer's reasonable satisfaction. *See id.* Because the district court determined that reasonable jurors could differ on this question, it held that Godfredson had presented a genuine issue of material fact as to whether he was qualified for his position.

Whether Godfredson was so qualified at the time of his termination is a close question. Certainly, Moorman's testimony and the significant losses suffered by Hess & Clark as a result of KenVet Nutritional Care's failure support a finding that Godfredson was not meeting his employer's legitimate expectations. Bookmyer's testimony, however, reveals that Godfredson was not necessarily the sole party at fault for this failure. Moreover, Godfredson worked satisfactorily at Hess & Clark for years prior to the pet food business's failure, and one can infer that he would not have been given significant responsibility for KenVet Nutritional Care's marketing if his performance had been unacceptable. For these reasons, we agree with the district court that Godfredson had raised a genuine issue of material fact as to this issue.

### 2. *Was he terminated as part of a reduction in force?*

■ Godfredson disputes his employer's claim that he was discharged in connection with a reduction in force, specifically contending that he was replaced by two younger employees, Housewright and Moorman. This court in *Barnes v. GenCorp Inc.*, 896 F.2d 1457 (6th Cir.

1990), explained that determining whether a discharged employee is "replaced" is the key to deciding if the company has engaged in a valid reduction in force:

> A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, *a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.* A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

*Id.* at 1465 (emphasis added).

In support of his argument that he was replaced, Godfredson cites *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519 (6th Cir.1997). Tinker was terminated from his employment at Sears as part of a reduction in force. Shortly thereafter, an existing Sears employee assumed Tinker's former duties. In changing the existing employee's status from part-time to full-time, Sears had to "fundamentally change the nature of his employment . . . in order to have him assume Tinker's duties in addition to his own." *Id.* at 522. This court held that the circumstances in *Tinker* were analogous to hiring a new employee to assume the duties of a discharged employee, and thus constituted replacement. *See id.; see also Wilkins v. Eaton Corp.*, 790 F.2d 515, 521 (6th Cir.1986) (holding that the plaintiff was replaced when another employee was promoted from part-time to full-time and his new position required him to perform duties for which he had not previously been responsible).

The district court in the present case noted that *Tinker* has called *Barnes* into question. We disagree. *Barnes* holds that "a person is not replaced when anoth-

er employee is assigned to perform the plaintiff's duties in addition to other duties . . . ." 896 F.2d at 1465. Although the replacement employee in *Tinker* was an existing employee, he was analogous to a new hire in that his status shifted from part-time to full-time and his position had to be "fundamentally changed." He did not assume additional tasks while continuing to perform his prior responsibilities. For these reasons, the *Tinker* court determined that the discharged employee had been replaced. *See Tinker,* 127 F.3d at 522. Although the court held that the facts before it in *Tinker* were analogous to those in *Wilkins,* it did not question the validity of *Barnes. Tinker* is simply an application of the analysis proposed in *Barnes,* and both cases must therefore be considered in determining whether Godfredson was replaced in the present case.

Contrary to the facts in *Tinker,* the record in the present case supports the district court's conclusion that Godfredson was not in fact "replaced." Housewright and Moorman, both existing Hess & Clark employees, assumed Godfredson's duties after his discharge "in addition to [their] other duties." They both maintained their prior job titles and responsibilities. Moreover, both of these men performed work related to that performed by Godfredson prior to the reduction in force. Godfredson was thus not "replaced," making the reduction-in-force analysis the appropriate standard in the case before us.

Because Godfredson was terminated as part of a genuine reduction in force, he must establish that there was "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out [the plaintiff] for discharge for impermissible reasons" in order to survive summary judgment.

3. *Was there additional evidence indicating that the employer singled him out for discharge for impermissible reasons?*

Godfredson argues that he was singled out for discharge for impermissible reasons. He claims that the other employees who were terminated as a part of the alleged reduction in force worked exclusively for KenVet Nutritional Care. In contrast, Godfredson worked for both KenVet Nutritional Care and KenVet, and his salary was allegedly derived solely from the latter's budget. He points out that he was the only employee working for both businesses who was terminated, and that he was older than any of the retained employees. Godfredson therefore argues that he was singled out for discharge, and that the reduction in force was used as "a pretext to hide age discrimination."

The record, however, does not support Godfredson's claims. Godfredson devoted the majority of his time to KenVet Nutritional Care and held a position of significant responsibility in that division. Because both KenVet and KenVet Nutritional Care are owned by Hess & Clark, the precise source of Godfredson's salary is irrelevant. Furthermore, although he was older than the retained employees, more than half of the 18 other KenVet and KenVet Nutritional Care employees who were terminated as part of the reduction in force were less than 40 years of age. Godfredson therefore failed to satisfy this fourth prong of the *prima facie* framework under the ADEA.

4. *Was the reduction in force pretextual?*

Even if we concluded that Godfredson had established a *prima facie* case of age discrimination, he would still not prevail unless he could show that Hess & Clark's proffered reason for termination— the reduction in force—was pretextual. "An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.,* 155 F.3d 799, 805–06 (6th Cir.1998).

The district court held that Godfredson failed to make this showing, stating as follows:

> Hess & Clark fired Godfredson because the plaintiff was director of marketing for a project that lost more than $10 million in less than three years. Eighteen employees besides the plaintiff also lost their jobs. Godfredson lacks evidence that age played a role in this decision. More than one-half of the employees discharged during the summer of 1995 were less than 40 years old.

We agree. The additional evidence that Godfredson presented on this point is legally irrelevant to the issue of whether the reduction in force was pretextual. First, he claims that an Ohio civil rights investigator stated that another Hess & Clark employee was threatened with an adverse job action if he said anything that would hurt the company. Because this statement is hearsay and not related to Godfredson's termination or the reduction in force, it cannot be considered in our summary judgment review. *See U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1189 (6th Cir.1997) (stating that hearsay and irrelevant evidence must be disregarded in considering the response in opposition to a motion for summary judgment).

Second, Godfredson claims that he was isolated within the company, that he did not receive any prior warning of his termination, and that earlier performance reviews were withheld from him. None of these allegations, however, even if true, shows that Hess & Clark discriminated against him on the basis of age or that he was not terminated as part of a legitimate reduction in force.

Third, Godfredson contends that he was not permitted to transfer within the company or given the opportunity to sell the business in which he was involved. This court, however, has held that an employer has no duty to transfer an employee to another position within the company when the employer reduces the work force for economic reasons. *See Ridenour v. Lawson Co.,* 791 F.2d 52, 57 (6th Cir.1986). And if an employee has no right to transfer within the company after a reduction in force, he or she certainly does not have the right to require that the eliminated business be sold.

Fourth, Godfredson argues that his termination saved Hess & Clark money in future pension costs. But this is the case whenever an employer terminates an employee, and provides no basis for establishing pretext.

Finally, Godfredson relies on *Hillebrand v. M–Tron Industries, Inc.,* 827 F.2d 363 (8th Cir.1987), in which the court discussed several factors that might indicate that an alleged reduction in force is pretextual. These factors include general business improvement, a lack of evidence regarding a company's objective plan to carry out a reduction in force, and a situation in which only one or two management employees are aware of the reduction plan. *See id.* at 367–68. Godfredson claims that there is a genuine issue of material fact with respect to all of these factors in the present case. Even if we were to adopt these factors, however, Godfredson has failed to provide any factual support for his position because (1) the pet food company failed to make a profit, (2) there was evidence of an objective plan to carry out a reduction in force, and (3) there was testimony that at least three individuals participated in the plan to terminate numerous KenVet employees in connection with the reduction in force. An analysis of the *Hillebrand* factors is thus completely consistent with a genuine reduction in force, and there is no material evidence to the contrary.

For all of the above reasons, we agree with the district court's conclusion that Godfredson failed to raise a genuine issue as to whether Hess & Clark's reduction in force was pretextual.

*5. Was he discriminated against with respect to severance pay?*

As part of his ADEA claim, Godfredson also alleges that was discriminated

against with respect to his severance pay. He specifically claims that he received lower severance pay than another Veratec employee, David New. New, he points out, served five or six years with Hess & Clark and then received six months salary as severance pay, whereas Godfredson served five years and received less than two months severance pay. Moreover, he argues that the conflicting testimony of Bookmyer and Moorman regarding the basis upon which the 1995 severance packages were calculated "create[s] an inference that the articulated basis for the disparate treatment 'in severance pay is pretextual."

We find that the record does not support Godfredson's allegations. First, there is no evidence regarding New's age or contract terms at the time of his termination. Because he was not terminated as part of the 1995 reduction in force, Godfredson failed to establish that New was a similarly situated employee. A comparison of Godfredson's and New's severance packages is therefore irrelevant. Second, the July 12, 1990 letter agreement signed by Godfredson prior to his employment with Hess & Clark clearly stated that he would receive 12 months severance pay if he was terminated during the first two years of employment. Because Godfredson was terminated in 1995, five years after his start date at Hess & Clark, he was not due any severance pay at all. Third, Godfredson conceded in his deposition that he was aware of only two other individuals who had been offered severance packages as part of the 1995 reduction in force. He testified that these employees received severance packages that were the same as or smaller than his own. Finally, the conflicting testimony regarding the calculation of the severance pay is insufficient to raise a genuine issue of material fact on this claim. Godfredson's allegations of discrimination on the basis of severance pay are therefore without merit.

### C. Wrongful discharge in violation of Ohio's public policy

█ Godfredson also claims that he was wrongfully discharged in violation of Ohio's public policy prohibiting termination on the basis of age. The evolving law of public policy torts in Ohio was recently clarified by the Ohio Supreme Court in *Kulch v. Structural Fibers, Inc.,* 78 Ohio St.3d 134, 677 N.E.2d 308 (1997). *Kulch* sets forth the following four elements of the tort of wrongful discharge in violation of public policy under Ohio law:

1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).
2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).
3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).
4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Id.* at 321 (internal citations and quotation marks omitted) (brackets and emphasis in original).

Even assuming that Godfredson can satisfy the first three elements of this tort, he cannot satisfy the final element. As previously discussed in Part B.4. above, Godfredson failed to raise a genuine issue of material fact regarding his claim that Hess & Clark's legitimate business justification for his dismissal—the reduction in force—was pretextual. In addition, Godfredson acknowledges in his appellate brief that the success of his public policy claim is contingent upon the success of his ADEA claim. We therefore affirm the grant of summary judgment as to his claim of wrongful discharge in violation of Ohio's public policy.

### D. Intentional infliction of emotional distress

█ Godfredson further claims that his discharge from Hess & Clark gives rise

to a cause of action for the intentional infliction of emotional distress. The Ohio Supreme Court has held that a plaintiff may establish such a tort only if "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of America,* 6 Ohio St.3d 369, 453 N.E.2d 666, 671 (1983) (quoting RESTATEMENT (SECOND) OF TORTS § 46 (1965)).

■ In support of this claim, Godfredson fails to allege any facts beyond those supporting his charge of discrimination under the ADEA. But an employee's termination, even if based upon discrimination, does not rise to the level of "extreme and outrageous conduct" without proof of something more. If such were not true, then every discrimination claim would simultaneously become a cause of action for the intentional infliction of emotional distress. *See Baab v. AMR Services Corp.,* 811 F.Supp. 1246, 1269 (N.D.Ohio 1993) ("[T]o say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement."); *Bryans v. English Nanny and Governess Sch., Inc.,* 117 Ohio App.3d 303, 690 N.E.2d 582, 592 (1996) (holding that even if the plaintiff-student proved her claim of discrimination on the basis of disability, the school's conduct was "not so extreme or outrageous as to be intolerable in a civilized community").

■ Godfredson's testimony that Bookmyer had always been civil to him, that he was courteous to him during the termination meeting, and that no one was trying to embarrass or humiliate him also tend to negate any claim of intent to inflict emotional distress. Moreover, in order to establish "serious" or "severe" emotional distress, a plaintiff must show that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress generated by the circumstances of the case." *Reynolds v. Wingers, Inc.,* 86 Ohio App.3d 742, 621 N.E.2d 1239, 1243 (1993). None of the conditions of which Godfredson complains (upset stomach, loss of sleep, and financial concerns) rises to this level of seriousness or severity. *See id.* ("The term 'serious' goes beyond a trifling mental disturbance, mere upset, or hurt feelings, as it describes an emotional injury which is both severe and debilitating."). We therefore affirm the district court's summary judgment as to this claim.

### E. Promissory estoppel

■ Finally, Godfredson asserts a claim based upon the common law theory of promissory estoppel. In Ohio, employment is generally at-will unless otherwise agreed to by the parties. *See Humphreys v. Bellaire Corp.,* 966 F.2d 1037, 1040 (6th Cir.1992). One of the few exceptions that alters this general rule is promissory estoppel. *See id.* at 1041. To prove a claim for promissory estoppel in the employment context, the Ohio courts require a plaintiff to establish "(1) that the employer made a promise, (2) which it reasonably should have expected to induce action or forbearance by the employee, (3) that there was such action or forbearance, and (4) injustice can only be avoided by enforcement of the promise." *Id.* at 1041. Regarding the promise element, the Ohio Supreme Court has stated that "a promise of future benefits or opportunities without a specific promise of continued employment does not" constitute promissory estoppel. *Wing v. Anchor Media, Ltd. of Texas,* 59 Ohio St.3d 108, 570 N.E.2d 1095, 1099 (1991). *See also Kasuri v. St. Elizabeth Hosp. Med. Ctr.,* 897 F.2d 845, 852–53 (6th Cir.1990) (relying on a decision of the Ohio Court of Appeals to the effect that a plaintiff must show that the employer's promise was "clear and unambiguous in its terms.").

In support of his claim, Godfredson argues that he was not an at-will employee because (1) the July 12, 1990 letter agree-

ment, which he signed on August 3, 1990, was invalid, and (2) he did not understand the term "at-will." As to his first point, Godfredson alleges that the letter agreement is invalid because it was contingent upon the sale of Veratec to Hess & Clark, and that it was executed after Godfredson began his employment with Hess & Clark. Godfredson correctly points out that the letter agreement was contingent upon Hess & Clark's purchase of Veratec. This contingency, however, was satisfied on August 12, 1990. Moreover, Godfredson's own testimony reveals that he began his employment with Hess & Clark on August 10, 1990, seven days after he signed the letter agreement. His first argument regarding invalidity is therefore without merit.

As to his second point, Ohio law dictates that "[w]here the parties, following negotiations, make mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, courts will give effect to the parties' expressed intentions ... *Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence.*" *Astor v. International Bus. Machines Corp.*, 7 F.3d 533, 539 (6th Cir.1993) (internal quotation marks and citation omitted) (emphasis and omissions in original). Although the parties dispute whether Godfredson truly understood the meaning of the term at-will, he unquestionably signed three agreements that clearly described his employment as such. The term at-will, a common term in the employment context, is not ambiguous, and Ohio law therefore dictates that this court give effect to the parties' written intention of at-will employment.

Moreover, Ohio case law clearly states that promissory estoppel does not apply in cases where an employee has a written contract of at-will employment. *See Lane v. Terminal Freight Handling Co.*, 775 F.Supp. 1101, 1105 (S.D.Ohio 1991) ("Although an implied contract or promissory estoppel may take a case out of the employment at will doctrine, this does not hold true where there is an unambiguous written contract to the contrary.") (internal citation omitted); *Borowski v. State Chemical Mfg. Co.*, 97 Ohio App.3d 635, 647 N.E.2d 230, 235 (1994) ("Promissory estoppel does not apply to oral statements made prior to the written contract, where the contract covers the same subject matter."). We therefore affirm the district court's summary judgment as to this claim.

### III. CONCLUSION

For all of the reasons stated above, we **AFFIRM** the judgment of the district court.