NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 15a0474n.06

Case No. 14-3412

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| NELIDA LOPEZ, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| | ) | OHIO |
| AMERICAN FAMILY INSURANCE | ) | |
| COMPANY; AMERICAN FAMILY | ) | |
| MUTUAL INSURANCE COMPANY; | ) | |
| AMERICAN FAMILY LIFE INSURANCE | ) | |
| COMPANY; AMERICAN STANDARD | ) | |
| INSURANCE COMPANY OF WISCONSIN; | ) | |
| AMERICAN STANDARD INSURANCE | ) | |
| COMPANY OF OHIO; AMERICAN | ) | |
| FAMILY BROKERAGE, INC.; AMERICAN | ) | |
| FAMILY SECURITIES, L.L.C.; AMERICAN | ) | |
| FAMILY FINANCIAL SERVICES, INC., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

**BEFORE: COOK and WHITE, Circuit Judges; MICHELSON, District Judge.[*]**

**MICHELSON, District Judge.** Nelida Lopez, a Hispanic woman in her early fifties, was displaced from her position as a district sales manager at American Family Insurance Company when the company restructured its Ohio sales districts. When she failed to obtain another position within the company, Lopez was terminated. She sued her former employer for

---

[*] The Honorable Laurie J. Michelson, United States District Judge for the Eastern District of Michigan, sitting by designation.

race and age discrimination and intentional infliction of emotional distress. The district court granted summary judgment to her former employer on all claims, and we affirm.

## I.    BACKGROUND

The facts of the case are presented in the light most favorable to Plaintiff-Appellant Lopez.

American Family is a private mutual company headquartered in Madison, Wisconsin, that offers property, casualty, automobile, commercial, life, health, and homeowners insurance, as well as investment and retirement-planning products.[1] The company entered the Ohio insurance market in 1996. Lopez, who is Hispanic, began working for American Family as an independent insurance agent in Avon Lake, Ohio, in 2001. After strong performance, Lopez was promoted to an Ohio district-manager position in 2006. There is no dispute that Lopez performed well as a district manager. Her salary increased each year, and she received the highest annual bonus for customer satisfaction among Ohio district managers in 2009.

In late 2009, American Family informed the Ohio district managers that it planned to realign their districts to reduce the number of district managers from thirteen to eight or nine. The thirteen existing district managers were given the opportunity to apply for the eight or nine district-manager positions. They could also apply for other posted positions in the company. And they were told that "[i]f available, an agency opportunity may be extended." They were told that their employment would be terminated unless they found a position within American Family by March 31, 2010. Two district managers opted to take agency positions instead of competing for

---

[1] Lopez dismissed her claims against five of the eight American Family entities named in the Complaint, leaving only American Family Mutual Insurance Company, American Family Life Insurance Company, and American Standard Insurance Company of Wisconsin as defendants. The district judge and the parties generally do not distinguish among these entities, referring to them collectively as "American Family." We follow suit.

the district-manager positions, and at some point—the timing is unclear—it was decided that there would be only eight district managers. So ultimately, eleven candidates competed for eight positions. Lopez was the second-oldest candidate, at 52 years old. She was also the only racial minority. After the process was complete, Lopez was the only candidate who did not continue working for American Family.

According to American Family regional vice president Richard Steffen, he and Ohio sales director LaTunja Jackson decided together on the selection criteria for the restructured district-manager positions. They decided to rely primarily on an interview process that included business-plan presentations by each candidate. Steffen testified that because "there was a lot of consistency" in the district managers' past performance, the interview and business plan weighed "heavily" in the decision-making process.

Jackson and American Family human resources representative Deborah Lacey conducted the interviews. They gave each candidate a numeric score for each of nine categories. The nine scores were added together for a total score by which the candidates were ranked. Jackson and Lacey generally scored the candidates individually and then reached consensus during post-interview discussions. There were four categories of interview questions, each of which was scored separately. For the first score, each candidate was asked to discuss three accomplishments, three challenges, and their greatest contribution to American Family. The interview then focused on three "targeted selection" questions: (1) leadership during change, (2) the candidate's corporate vision and strategy, and (3) the candidate's ability to manage a team of agents. A score was assessed for each of these three categories. Then each candidate presented a business plan for which another score was assessed. Separate scores were also assigned for each candidate's (1) application materials, (2) educational commitment, (3) employment history,

and (4) overall impact as a candidate. Jackson testified that the candidates' past performance was not included in the scoring because "everyone was performing well" and "there were no outliers."

Lopez's total score of 15 was the lowest overall score among the eleven candidates. Stephen Graham, the oldest district manager, received the second-lowest score, 21.5. He was offered a position as an agent in Columbus, Ohio, which he accepted. The fifth-ranked candidate, Andi Simpson, also did not receive a district-manager position. According to Jackson and Steffen, this was because she had only been a district manager for six months, but had thirteen years of experience as an agent and scored highly in the interview process. They therefore felt she would be a good candidate for a newly created position that was similar to the district-manager position but without management responsibilities. Thus, the restructured district-manager positions were awarded to the candidates with the first through fourth and sixth through eighth-highest scores. Their scores ranged from 24.5 to 36.

On January 25, 2010, Jackson informed Lopez that she was not selected for a district-manager position. Sometime in late January and February, Lopez learned of three opportunities at American Family: (1) an open team-manager position in Arizona, (2) an open agency position in Arizona, and (3) the agency of Hans Hansen in Ohio. The Hans Hansen agency—essentially a collection of policies or "book of business" previously managed by Hansen—was formally offered to Lopez. And Lopez believed that the agency position in Arizona was essentially open to her if she wanted it, based on emails and telephone conversations with the district manager for the position, Denny Sand. On March 1, 2010, Sand emailed her pictures of the office. And from February 21, 2010, through March 2, 2010, he included her on emails to the agents in his district.

But Lopez had told Jackson "from the very beginning that [she] wanted to stay in management." Lopez interviewed for the Arizona management position in mid-February. On February 24, she emailed Jackson to let her know that the interview process might take longer than expected because a Spanish language proficiency test might be required. Jackson responded, "No problem, Nellie. We will give you the time you need to complete the process."

Then on February 26, 2010, Jackson emailed Steffen about some issues with Lopez's expense reimbursement requests. As a district manager, Lopez had an expense account for overhead costs, such as rent and staff for her office. The money in the expense account was taken out of the district manager's gross pay. Managers were required to select one of three options: 30, 35, or 40 percent. The accounts did not roll over, so money not spent during the year was forfeited. Jackson testified that although Lopez and Graham were no longer district managers in February, "they received that budget so that they could handle their office, staff, utilities, and things like that because those expenses still existed as they were trying to look for other opportunities." She said she conveyed this to Lopez and Graham. With Steffen's permission, Jackson rejected Lopez's requests to be reimbursed for six office chairs, totaling $2,144.05; a step ladder for $155.00; a rolling briefcase and tote for $1,389.98; and an Arizona insurance license for $126.18.

On Tuesday, March 2, 2010, Lopez told Jackson that she would not be taking the Hans Hansen opportunity because she preferred the Arizona positions. Lopez then immediately called Sand to accept the Arizona agency position, but they did not speak until he returned her call three days later, on March 5. Sand told her that the position was no longer available.

In an email written to Todd Straub (an American Family employee with responsibility for distributing the Hans Hansen policies) at about 8:00 a.m. on Friday, March 5, Jackson said she

told the people making hiring decisions for the Arizona positions—the sales director for Arizona (Sand's supervisor) and the supervisor for the team manager position—about the expense issues. She also noted that because Lopez had indicated she was planning to pursue the Arizona opportunities, Jackson would "be moving forward to disburse the [Hans Hansen] policies." Jackson testified at her deposition that expense investigations were confidential, and typically reported only to the individual's manager. She acknowledged that no policy required her to notify potential managers, but said "[t]here is an expectation as a manager that you disclose information that is pertinent to making good business decisions."

At about 6:00 p.m. that same day, Friday, March 5, Lopez told Jackson via email that the Arizona agency job was no longer available and therefore she would "need Hans book after all if the Team Managers position does not pan out." Jackson spoke with someone in Human Resources the following Monday, March 8, before responding to Lopez. She then called Lopez and explained that the process to distribute the Hans Hansen policies was already under way. When Lopez objected that she was aware the distribution had not yet taken place so the process could still be stopped, Jackson said she had already received approval from Steffen and therefore needed to proceed with the distribution. Steffen testified at his deposition that "the analysis had been done and the plan was in motion to disperse," but the policies "wouldn't be dispersed until the end of the month."

Lopez learned that she did not get the Arizona management position around March 20, 2010.[2] American Family terminated Lopez's employment on March 31, 2010.

In September 2010, Lopez filed a charge of race and age discrimination with the Equal Employment Opportunity Commission (EEOC). After receiving a right-to-sue letter from the

---

[2] Lopez does not challenge American Family's decision not to hire her for the Arizona management position.

EEOC, Lopez filed a complaint alleging race discrimination in violation of Title VII and Ohio law; age discrimination in violation of the Age Discrimination in Employment Act (ADEA) and Ohio law; breach of Ohio public policy; and intentional infliction of emotional distress under Ohio law. The district court granted American Family's motion for summary judgment on all of Lopez's claims. Lopez appeals her race and age discrimination claims and her intentional-infliction-of-emotional-distress claim.

## II.  DISCUSSION

We review a district court's grant of summary judgment de novo. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008) (citing *Mutchler v. Dunlap Mem'l Hosp.*, 485 F.3d 854, 857 (6th Cir. 2007)). "Summary judgment is proper only if the moving party shows that the record does not reveal a 'genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted) (citing *First Nat. Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

### A.  Race Discrimination

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Ohio's anti-discrimination law is in accord. *See* Ohio Rev.

Code § 4112.02(A) ("It shall be an unlawful discriminatory practice: (A) For any employer, because of the race . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.").

Lopez alleges that American Family's decisions to displace her and then terminate her employment were based on mixed motives. In a mixed-motive race-discrimination claim, both legitimate and illegitimate reasons are alleged to have motivated the adverse employment action. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 711 (6th Cir. 2006) (internal citations omitted).[3] Lopez's claim survives summary judgment if she produces evidence sufficient to convince a jury that: (1) American Family took an adverse employment action against her; and (2) race was *a* motivating factor for American Family's adverse employment action. *White*, 533 F.3d at 400.[4] Because American Family concedes that it took adverse employment actions against Lopez, she need only demonstrate that she produced evidence sufficient that a jury could find that her race was *a* motivating factor for her displacement or her eventual termination from American Family. Lopez argues that she met this burden with evidence showing that (1) American Family

---

[3] Claims brought pursuant to Title VII's provisions are generally subject to the burden-shifting framework first announced by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 793 (1973), and subsequently modified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 (1981), unless there is direct evidence of discrimination. *See, e.g.*, *Lindsay v. Yates*, 498 F.3d 434, 440 n.7 (6th Cir. 2007) ("The *McDonnell Douglas/Burdine* framework applies only when discrimination plaintiffs rely on circumstantial evidence to prove their claims."). But the *McDonnell Douglas/Burdine* "burden-shifting framework does *not* apply to the summary judgment analysis of Title VII mixed-motive claims." *White*, 533 F.3d at 400 (emphasis in original).

[4] Lopez claims that the district court employed an incorrect and overly stringent standard when it stated that "to survive summary judgment, Plaintiff must . . . demonstrate that her race was a motivating factor." But the district court correctly stated elsewhere that the "ultimate question is whether there are any genuine issues of material fact . . ." and in the end applied that standard.

displaced her because it was deemphasizing the Hispanic market, and (2) American Family violated its own policies when it did not offer her an alternative position.[5]

The first argument relies primarily on Lopez's testimony that American Family market consultant Louis Besses told her, sometime in 2007 or 2008, that he was being transferred from Ohio to Georgia because American Family was "deemphasizing the Hispanic market" in Ohio.[6] Lopez explained that Besses's role in Ohio had been to develop the Hispanic and African-American markets. Lopez had worked with Besses to develop the Hispanic market, such as by going to events and meeting with leaders in the Hispanic community. Lopez acknowledged that Besses continued to work in Ohio and attend such events with her, but said he was there about half as often as previously. And she testified that around 2008, American Family limited the budget that funded her attendance at events related to the Hispanic market, so that she had to pay out of pocket for some events. Jackson's testimony supports that American Family was previously interested in hiring Hispanic employees. She testified that when she hired Lopez to be a district manager, although her priority was to find the best candidate, she was "also hoping that [she] could find some great candidates that would allow [American Family] to represent [its] market." And Jackson said that while Lopez was a district manager, Jackson had asked Lopez for help finding more Hispanic agents. Lopez argues that based on this evidence, a jury could

---

[5] Lopez also argues that the interview process used to displace her as a district manager was pretextual. She points to peculiarities in the scoring for employment history and the fact that the fifth-ranked applicant, Andi Simpson, was not given a district manager position. Pretext need not be established at the summary judgment stage of a mixed-motive claim. *See White*, 533 F.3d at 400–01. And as discussed below with respect to Lopez's age discrimination claim, American Family provided reasonable explanations for all the purported inconsistencies in the interview process. The interview process is not circumstantial evidence from which a jury could infer discrimination.

[6] American Family asserts that these statements constitute inadmissible hearsay, and Lopez responds that they are admissible as admissions of a party opponent under Fed. R. Evid. 801(d). Our analysis assumes admissibility.

conclude that American Family displaced and terminated her because it was no longer interested in developing the Hispanic market in Ohio—and thus that her race was a motivating factor in their decisions.

The plaintiff's burden to produce evidence in support of a mixed-motive claim is "not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *White*, 533 F.3d at 400. Nonetheless, this standard does require *some* evidence of discriminatory bias that has some connection to the adverse employment action. In *White*, for example, the plaintiff's supervisor made comments "that a jury could reasonably find to be indicative of racial bias." *Id.* at 404. And in *Griffin v. Finkbeiner*, 689 F.3d 584 (6th Cir. 2012), we engaged in a lengthy analysis of whether the mayor's racially insensitive comments could be connected to the plaintiff's termination from his job for the city. We said, "[i]n determining whether discriminatory comments are circumstantial evidence of discrimination in a particular case, we consider factors such as the identity of the speaker, the nature and substance of the comments, and the temporal proximity of the comments to the challenged decision." *Id.* at 595; *see also Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 429 (6th Cir.) (affirming summary judgment for the employer on mixed-motive discrimination claim because there was no evidence indicating that the person with decisionmaking authority harbored animus against African–Americans), *cert. denied*, 135 S. Ct. 84, 190 L. Ed. 2d 230 (2014).

Here, Lopez's testimony that Besses told her the company was de-emphasizing the Hispanic market, coupled with the alleged decrease in American Family's presence at Hispanic events and Jackson's admission (viewing the evidence in the best light for Lopez) that she hired Lopez because she was Hispanic, is not a sufficient basis on which a jury may infer racial

discrimination in Lopez's displacement and termination two years after Besses's statement was made. Two years is a long gap over which to infer a causal connection. *Cf. Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998) (finding that ageist comments allegedly made two months and fourteen months before plaintiff's termination were relevant circumstantial evidence for the jury to consider in evaluating plaintiff's age discrimination claim). And Lopez has not provided any evidence that Jackson or any other decisionmaker associated with Lopez's displacement and termination were also part of the decision to move Besses to Georgia, or were likely to be influenced by a decision to de-emphasize the Hispanic market in Ohio. *See Griffin*, 689 F.3d at 595 ("Generally, discriminatory comments can qualify as evidence that a particular decision was discriminatory if the speaker was 'in a position to influence the alleged decision.'"). On the contrary, Jackson's testimony suggests that Besses' move and marketing decisions generally were made by a separate corporate division. In short, the connection Lopez tries to draw here is simply too attenuated to support an inference of discrimination.

Lopez has, rightly, not argued that American Family's pursuit of the Hispanic market, or its strategy to do so by hiring Hispanic agents, was improper. That American Family may have (lawfully) considered race in hiring and pursuing customers cannot suffice to show that they (unlawfully) considered race in displacing and terminating Lopez. If it could, a company that conducted race-based targeted marketing or hiring would risk liability every time it made changes to that practice. Not every reference to a protected characteristic is suggestive of discrimination. *See Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009) (quoting *Ercegovich*, 154 F.3d at 357, and holding that when evidence of allegedly discriminatory

remarks is offered in support of a discrimination claim, we consider the "purpose and content of the statement," among other factors).

Lopez next argues that a jury could infer discrimination from American Family's failure to offer her an open position after displacing her as a district manager despite its stated policy that it would do so. First, Lopez overstates American Family's policy. The displaced district managers were told that they would have the opportunity "to apply for" posted positions within the company, that "[i]f available, an agency opportunity *may* be extended," and that "[i]f not selected for one [of the] district sales manager openings or any other employee or agent position in the company, severance pay will be available."

Second, Lopez does not dispute that Jackson offered her the Hans Hansen agency. She emphasizes that ultimately she was denied the position, and argues that "anytime [she] accepted an offer, she was told it no longer existed or was not being formally offered to her." But Jackson agreed to hold the Hans Hansen agency position open upon Lopez's request. It was denied only after Lopez said she did not need it, triggering a decision to distribute the policies to other agents. Lopez argues that Jackson could have and should have stopped the distribution, but Lopez had not even said she wanted the position at that point. She said only that she would need it "after all if the Team Managers position does not pan out." And Jackson knew that Lopez preferred the Arizona management position—indeed, she knew that Lopez had already obtained an Arizona insurance license.

Lopez apparently concludes that Jackson would have found some reason to deny her the Hans Hansen agency even if she had accepted it from the beginning. But she cites no evidence to support that. There is no suggestion in the record to support Lopez's allegation that Jackson or any other decisionmaker harbored a racial bias. And although Lopez argues that a company's

failure to follow its own policy "may constitute evidence sufficient to support a finding of discrimination," she cites no case law where such evidence, standing alone, sufficed. *See, e.g.*, *Morse v. S. Union Co.*, 174 F.3d 917, 922 (8th Cir. 1999) (affirming denial of defendant employer's motion for judgment as a matter of law based in part on evidence that the company president "expressed a strong preference for a younger workforce and encouraged [] supervisors to use their firing powers to effectuate company objectives"). And, as noted, American Family made no promise that a position would be offered, so it does not appear that any policy was violated.

Lopez has not met her burden to produce evidence sufficient for a jury to find that race was a motivating factor in her displacement or termination. Summary judgment on this claim is affirmed.

## B. Age Discrimination

Lopez argues that genuine issues of material fact remain regarding whether age motivated her displacement and termination. Under the ADEA it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Ohio law is in accord. *See* Ohio Rev. Code § 4112.02(A).

Unlike Lopez's race discrimination claim, to prevail on age discrimination "it is not sufficient for the plaintiff to show that age was a motivating factor in the adverse action; rather, the ADEA's 'because of' language requires that a plaintiff 'prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the "but-for" cause of the challenged employer decision.'" *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)). Lopez presents

only circumstantial evidence of age discrimination. Therefore, the *McDonnell Douglas*/*Burdine* framework applies. *See Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009); *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Generally under this framework, the plaintiff must first establish a prima facie case of age discrimination by showing that he or she "(1) was a member of a protected class of persons (i.e., persons 40 years of age or over), (2) was discharged, (3) was qualified for the position held, and (4) was replaced by someone outside of the protected class." *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008).

But where the adverse-employment action is part of a work-force reduction, "the fourth prong of the prima facie age discrimination showing is supplanted by a requirement that the plaintiff proffer 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out [the plaintiff] for discharge for impermissible reasons.'" *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1126 (6th Cir. 1998) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990)); *see also Jones v. Fluor Fernald*, *Inc.*, 216 F. App'x 461, 462–63 (6th Cir. 2006) ("To prevail . . . plaintiff must come forward with some evidence to rebut the presumption that the reduction in the workforce is the legitimate reason for her termination."). The additional evidence "must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of age." *Gragg v. Somerset Tech. Coll.*, 373 F.3d 763, 767–68 (6th Cir. 2004) (internal citations omitted). Lopez appears to concede that her situation involved a work-force reduction.

American Family apparently concedes that Lopez can establish the first three elements of a prima facie case, and focuses its argument on whether she can establish this heightened fourth prong. Lopez argues that she can establish that American Family singled her out based on her age. She argues that the two oldest applicants were singled out for displacement, and that the

older candidates were disadvantaged because experience was not factored into the initial selection process.

That Lopez and Graham, the two oldest candidates, were displaced is not enough for Lopez to meet her burden. We have held "that a mere showing that the two oldest employees were selected for termination [] does not constitute additional evidence" necessary to satisfy the fourth prong. *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 267–68 (6th Cir. 2010). "[S]uch a small statistical sample is not probative of discrimination." *Id.* (citing *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 943 & n.7 (6th Cir. 1987)). The record shows that Lopez and Graham were asked the same questions and evaluated under the same criteria as the other candidates. And Graham was offered and accepted an alternative position at American Family. It is also notable that of the eight candidates who received restructured district-manager positions, five were over forty years old and thus members of the protected class for ADEA claims. *See Barnes*, 896 F.2d at 1466. (The other three were 32, 33, and 38.) Moreover, there were in fact five district managers displaced by the restructuring, not two, and they were not the five oldest of the thirteen original district managers.

Lopez also makes much of the fact that Andi Simpson was not given a district-manager position despite scoring fifth in the interview process. But Simpson was 44—the same age as Bob Sturgill, the ninth-ranked candidate who received a district-manager position. American Family's treatment of Simpson does not give rise to an inference of age discrimination. Furthermore, if Simpson had been given a position instead of Sturgill, Lopez would still have been displaced.

Lopez's second argument, that the older candidates were disadvantaged by the selection process, is also not sufficient to support an inference of intentional age discrimination. American

Family articulated a legitimate, nondiscriminatory reason for not considering past performance—that all the district managers were performing well—which Lopez has not disputed. There is nothing improper about the Company's business decision to focus more heavily on skills for leading the Company into the future, especially with a pool of well-performing candidates. And American Family provided plausible explanations for Lopez's low scores in that regard. Jackson said she found Lopez's business plan confusing and very similar to the plan she presented in 2006 when she first interviewed for the district manager position. "She wasn't able to communicate what it would be that she was going to do to move her district forward in 2010." In addition, Lopez "discredited" and made negative comments about other district managers during her interview.

Moreover, the quantity of each candidate's experience was part of the selection process, contrary to Lopez's arguments. Lacey testified that one part of the composite score was for "employment history" and was based on the candidate's insurance and sales experience. Even if it had been given greater weight in the scoring, Lopez would not have fared any better than she did. When each candidate's tenure at American Family, as either a district manager or an agent, is compared, Lopez is eighth of the thirteen. But two of those below her (Steve Ulanowski and Lisa Senger) had significant experience as a sales manager before coming to American Family. In comparison, Lopez's prior employment was as a landlord and an inventory planner. It is unlikely Lopez would have received a district manager spot based on experience alone.

Lopez argues that there were inconsistencies in how the employment history scores were assigned. The scores were tightly clustered: ten candidates received a score of four, and three candidates, including Lopez, received a score of three. Lopez focuses on the fact that Lisa Senger, a candidate who received a restructured district-manager position, scored higher than

Lopez in employment history despite having worked only four years at American Family where Lopez had worked more than eight. She also found it suspicious that there were question marks and blank spaces for the employment history score in the interview packets. Jackson explained that was probably because she and Lacey decided that Lacey would go back after the interviews and evaluate employment history for each candidate, to ensure those scores were consistent. And both Lacey and Jackson explained that Senger was given a four because they valued Senger's more than ten years of previous experience as a sales manager at another company.

Lopez has not pointed to anything so irregular in the employment history scoring that it would give rise to an inference of discrimination. *See Browning v. Dep't of Army*, 436 F.3d 692, 697 (6th Cir. 2006) (holding that reliance on subjective criteria does not support an inference of discrimination absent a showing that it was used as a pretext to mask discrimination or some other link to discriminatory intent). This court has held that employers have latitude when establishing criteria for making decisions regarding their management. "Not only has this court afforded great flexibility to employers when selecting management personnel, but it has explicitly held that the law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. Rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons." *Browning*, 436 F.3d at 698 (internal quotation marks and citations omitted). Lopez has not demonstrated that genuine issues of material fact exist sufficient to support a finding that age was the "but-for" cause of her displacement or termination from American Family. We therefore affirm the district court's grant of summary judgment on this claim.

### C. Intentional Infliction of Emotional Distress

Lopez argues that genuine issues of material fact remain regarding whether American Family's actions toward her constituted intentional infliction of emotional distress under Ohio law. She contends that Defendants asked her to re-apply for a position she already had because they needed to downsize, ignored her history of positive past performance, and implemented an "illusory" interview process that was used to displace and eventually terminate her due to her age or race. She claims that American Family's actions were "extreme and outrageous" and that it "should have known they would cause emotional distress." Appellant Br. at 42.

To establish a prima facie case of intentional infliction of emotional distress under Ohio law, a plaintiff must show "(1) that the defendant intended to cause [or recklessly caused] the plaintiff emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress." *Phung v. Waste Mgt., Inc.*, 644 N.E.2d 286, 289 (Ohio 1994). Extreme and outrageous conduct gives rise to liability when conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 453 N.E.2d 666, 671 (Ohio 1983) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)), *abrogated on other grounds*, *Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2006). In addition, emotional distress is serious if it is "both severe and debilitating" such that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Paugh v. Hanks*, 451 N.E.2d 759, 765 (Ohio 1983). Examples of serious emotional distress "include traumatically induced neurosis, psychosis, chronic depression, or phobia." *Id.*

As the district court found, "[e]ven accepting all of [Lopez's] allegations as true, the circumstances [Lopez] describes cannot establish intentional infliction of emotion distress." First, Lopez cannot establish that American Family's conduct was extreme and outrageous. We have held that under Ohio law, an "employee's termination, even if based upon discrimination, does not rise to the level of 'extreme and outrageous conduct' without proof of something more. If such were not true, then every discrimination claim would simultaneously become a cause of action for the intentional infliction of emotional distress." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999); *see also Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1111 (6th Cir. 2008).

Further, Lopez has not presented evidence sufficient to demonstrate that she suffered a serious emotional injury. Lopez asserts that she "is under constant stress. She feels pain and tightness in her chest, as well as shortness of breath," and she struggles to maintain a positive outlook. "I did say how positive I am, and I tried to stay that way. But there's the word, 'I tried'. Not as easy as it used to be." Lopez alleges that the onset of these symptoms coincided with American Family's alleged discrimination against her. But Lopez has not sought medical treatment for these symptoms and testified that she has no plans to do so.

She did not "describe[] an emotional injury which is both severe and debilitating." *Godfredson*, 173 F.3d at 376. Lopez has not demonstrated that her alleged injuries are sufficiently severe. The district court properly granted American Family summary judgment on Lopez's claim of intentional infliction of emotional distress.

### III.   CONCLUSION

For these reasons, we **AFFIRM** the district court's grant of summary judgment to American Family on all claims.

**HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part.**

I agree that the district court properly granted American Family summary judgment on Lopez's age discrimination and intentional-infliction-of-emotional-distress claims. However, I would vacate the district court's grant of summary judgment on Lopez's mixed-motive race discrimination claim and remand for further proceedings.

The majority deems Jackson's admission that she hired Lopez because she was Hispanic, Lopez's conversation with Besses regarding the de-emphasis of the Hispanic market, and American Family's decreased presence at Hispanic events too attenuated to support an inference of discrimination. The majority explains that the two years between Besses's statements and Lopez's displacement is "a long gap over which to infer a causal connection," and that Jackson's testimony suggests that Besses's move and marketing decisions were made within separate divisions of American Family. But it is reasonable that Besses, then in charge of outreach to the Hispanic community, would be the first displaced in a multiple-year process of deemphasizing the Hispanic market. And, it does not follow from the fact that a different corporate division made marketing decisions that Lopez was not displaced pursuant to these shifting marketing goals.

The majority rejects Lopez's argument that Jackson would have found some reason to deny her the Hans Hansen position even if Lopez had initially accepted it, and further reasons that because American Family's policy was only that an open position might be extended to displaced managers, American Family did not violate any policy in its treatment of Lopez. However, Lopez presented evidence from which a jury could conclude that American Family made illusory offers of employment. Viewing the facts in the light most favorable to Lopez, a jury could conclude that although Jackson offered Lopez the Hans Hansen opportunity, she and

Steffen knew that Lopez declined that opportunity only because she was pursuing preferred positions in Arizona; that Jackson informed the Arizona managers to whom Lopez had applied for employment that Lopez's use of her expense account was under investigation (despite there being no policy requiring her to do so); and that the Hansen policies had not been distributed when Lopez told Jackson that she had not gotten the Arizona position, and would not actually be distributed until the end of the month. Even if this did not violate American Family policy, such treatment could reasonably be viewed as evidence of a discriminatory desire not to retain Lopez, especially in combination with Lopez's evidence regarding American Family's de-emphasis of the Hispanic market.

Moreover, while I agree that Lopez need not establish pretext at the summary judgment stage of a mixed-motive claim, Lopez supports her claim that the interview was pretextual with circumstantial evidence from which a jury could infer discrimination. In particular, Lopez points to irregularities in the scoring of the candidates' employment history.

Lopez has presented evidence sufficient to overcome her relatively light burden of demonstrating that her race "was *a motivating factor*" for American Family's actions, "even though other factors also motivated" its adverse employment actions. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 711 (6th Cir. 2006) (citing 42 U.S.C. § 2000e–2(m)). "This burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008). "[I]nquiries regarding what actually motivated an employer's decision are very fact intensive, [and] such issues will generally be difficult to determine at the summary judgment stage and thus will typically require sending the case to the jury." *Id.* at 402 (internal citations

and quotations omitted). Lopez presented evidence adequate to meet her light burden, and summary judgment for American Family on this claim was not appropriate.

For these reasons, I concur in part and dissent in part.